Hesse, Appellant, *v.* Traveler's Ins. Co.

Argued October 4, 1929. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.

126

*Elverton H. Wicks,* with him *Bialas, Ryan, McIntyre & Mackrell,* for appellant.—The only real question raised by the record is, whether such an anæsthetic death was occasioned by "external, violent and accidental means." If it was, then the lower court was wrong in refusing to take off compulsory nonsuit: Moyer v. Electric Co., 294 Pa. 265; Caldwell v. Tr. Co., 291 Pa. 35; Baumgartner v. R. R., 292 Pa. 106.

Death resulting from the necessary administration of an anæsthetic by a trained anæsthetist under the supervision of a physician is the unusual and unexpected result attending on the operation or performance of a usual or necessary act, and the death is therefore effected by accidental means: Ins. Co. v. Burroughs, 69 Pa. 43; Burkhard v. Ins. Co., 102 Pa. 262; Hey v. Indemnity Co., 181 Pa. 220; Pickett v. Ins. Co., 144 Pa. 79; Lane v. Baking Co., 261 Pa. 329.

It is submitted that the taking of the anæsthetic in the case at bar is analogous in principle to those cases where poison is inadvertently taken, since in our case the anæsthetic was poison to the insured: Bloom v. Accident Co., 85 Pa. Superior Ct. 398.

Death occasioned by drowning, asphyxiation or by the taking of any poison when such casualty is not designed by the insured, that is to say, when the act is not suicidal, is due to injuries effected through external, violent and accidental means.

Even though the insured, at the time the injury is received, is suffering from some disease, defect or bodily infirmity, the company is liable if the injury is sufficient to bring about death entirely independent of, and without any reference to, the disease.

*Samuel W. Pringle,* with him *Dalzell, Dalzell & Mc-Fall,* for appellee.—The evidence does not sustain a finding that the insured's death resulted solely from the administration of the anæsthetic as contended by appellant, but even if that were conceded, such death cannot be regarded as effected directly and independently of all other causes through external, violent and accidental means.

Since the necessary major operation was performed by the surgeon, chosen by the insured skillfully and without slip or mishap, a proper anæsthetic administered correctly and in proper proportions, and nothing unforeseen, unexpected or unintended occurred in the acts preceding the almost instantaneous death, such death was not effected solely by external, violent and accidental means, whether or not the anæsthetic alone caused the death: U. S. Mut. Accident Assn. v. Barry, 131 U. S. 100; Lane v. Baking Co., 261 Pa. 329; Semancik v. Casualty Co., 56 Pa. Superior Ct. 392.

Even though insured's death resulted from anæsthesia, it was not a death effected by accidental means, since the danger of death from anæsthesia is inherent in every such operation, and was a danger counted upon and recognized prior to the performance of the operation.

OPINION BY MR. JUSTICE SIMPSON, January 6, 1930:

Plaintiff, the beneficiary named in a policy of insurance issued by defendant, brought suit thereon; the trial judge entered a nonsuit, which the court in banc refused to set aside, and from that judgment the present appeal is taken. The policy insures "against loss resulting from bodily injuries, effected directly and independently of all other causes, through external, violent and accidental means," and upon this clause plaintiff necessarily relies for recovery. In our opinion the judgment appealed from must be affirmed.

The facts regarding the insured's death are not disputed. He was suffering from a disease of one of the

kidneys, which had been progressively growing worse. As a result of a careful examination, his physicians concluded it was necessary to perform an operation, and that he was in a proper condition to have it done. They advised him of the necessity, that the operation would be a major one, consisting of the removal of the diseased kidney, and that he would have to be anæsthetized by a specified anæsthetic, which was considered to be the safest one known. The insured consented and selected the operating surgeon. The anæsthetic was properly administered and the operation skillfully performed, without any slip, mischance or mistake, and without resulting in a hemorrhage or shock. After it was completed and while the doctors were closing the wound, the patient suddenly stopped breathing, and all efforts to revive him failed. All the physicians testified that such a result was exceedingly rare, occurring perhaps once in a hundred thousand administrations; that the reason why it ever occurred was unknown; and that the death was known as an anæsthetic death, due to the hypersusceptibility of the particular individual to the particular anæsthetic. No complaint is now made of anything that was done or left undone before, during or after the operation, but only that a death occurring under such circumstances was within the clause of the policy above quoted. To this we cannot agree. Before we apply the settled rule that a policy of insurance is to be so construed as to make certain that the beneficiary is not deprived of the indemnity provided for, we must first determine, under the plain language of the policy, if its language is untechnical and unambiguous, as here it is, what was the loss insured against: 14 R. C. L. 925; Northern Assurance Co. v. Grand View Building Association, 183 U. S. 308; Smith v. National Life Ins. Co., 103 Pa. 177, 182; Levinton v. Ohio Farmers Ins. Co., 267 Pa. 448, 451-2. This essential rule in the construction of insurance as well as all other contracts, compels us to decide the present case against appellant.

Even if we assume that the operation was a bodily injury within the meaning of the policy, we have it admitted that the insured's death did not result from the operation, but solely from the anæsthetic, neither the administration nor the effect of which could possibly be a bodily injury, certainly not, under the facts above recited, a bodily injury "through......accidental *means.*" There were no accidental means, all those employed were intentional. Nor, if appellant could escape this fact, would she be greatly helped, for decedent's "bodily injuries [were not] effected directly and *independently* of all other causes" through such means. On the contrary, admittedly the effective cause was his hypersusceptibility to the particular anæsthetic. Defendant did not insure against a loss resulting from such a cause, yet admittedly it was at least a contributing cause of the death, which did not result "independently" of it; and this alone is sufficient to exclude liability under the policy.

Kelley v. Pittsburgh Casualty Co., 256 Pa. 1, relied on as compelling an opposite conclusion, does not do so. In that case plaintiff slipped on icy ground, and thereby sustained an injury to his abdomen, to recover for which that suit was brought. The casualty company defended on the ground that plaintiff had adhesions of the bowels, following a previous operation for appendicitis, and that, if those adhesions had not existed, the accident to the plaintiff would not have had any serious results. The jury were told "that the plaintiff could not recover unless the testimony showed to their satisfaction that the slipping of the plaintiff as described by him was the sole, efficient cause [of the injury]......and that no other cause contributed" thereto. The legal principle applicable to that situation was stated to be that "The phrase 'resulting, directly, independently and exclusively in death' refers to the efficient, or, as some courts speak of it, the predominant cause of death at the time it occurs. In other words, it means the proximate cause." It will be noticed, however, that there the insurance

company could have ascertained the existence of the adhesions, if a proper examination had been made, while here plaintiff's hypersusceptibility to the anæsthetic could not possibly have been discovered. It will be recalled also that here there was no accident, as that word is ordinarily used, but that the efficient, predominant or proximate cause of plaintiff's death, was the hypersusceptibility referred to, and without this the death would never have occurred.

The judgment of the court below is affirmed.

DISSENTING OPINION BY MR. JUSTICE FRAZER:

Plaintiff sued to recover from defendant the amount of an accident insurance policy insuring her husband against "bodily injuries effected directly and independently of all other causes, through external, violent and accidental means." A compulsory nonsuit was entered by the trial judge at the close of plaintiff's case, and the present appeal was taken from the refusal of the court below to take it off.

Deceased was suffering from a diseased kidney, and after several acute attacks a medical examination was made, during which the presence of a kidney stone was discovered and the kidney itself so far destroyed as to be useless. An operation was recommended for the removal of the diseased organ, and it was decided to use nitrous oxide and oxygen as an anæsthetic. The physicians made the usual preliminary examination of the patient and decided his physical condition was proper for an operation, and while his blood pressure was somewhat low, this was considered no cause for alarm, and did not in any way contribute to the result which followed. The anæsthesia was administered in the usual way by an expert and there was nothing in the inductive stage tending to show unusual circumstances or conditions in the patient, but, on the contrary, his reactions were normal and his pulse remained normal throughout the operation. Although at one time during the opera-

tion the patient experienced difficulty in breathing, this situation was relieved at once by removal of what was referred to as a shelf, placed under the patient's abdomen for the purpose of rendering the kidney more accessible for the operation. After this device was removed or lowered the patient resumed normal breathing and further difficulty was not encountered until the completion of the operation and the operator was in the act of closing the wound, when the patient ceased breathing. He was immediately given artificial respiration and all known remedies were resorted to for reviving him but without effect. Three doctors who were present and assisted in the operation testified the anæsthetic was the cause of death. They testified further that such deaths were extremely rare and death was unexpected in this case, there being nothing in the patient's condition to give warning. The testimony is that nitrous oxide and oxygen had been considered the safest anæsthetic known, and the only explanation the doctors could give was that the patient had "an intolerance or idiosyncrasy to the gas anæsthetic" and there was nothing in the reaction of the patient to indicate he had such idiosyncrasy which the doctors referred to as a condition and not a disease.

We find medical testimony to the effect that hypersensibility to anæsthesia, if present in a patient, would always appear immediately upon the anæsthetic being administered, but there is no known way of determining beforehand the presence of such condition in the patient. One physician, in response to questions asked by the court, testified as follows: "Then do I understand that an anæsthetic death is due to some unforeseen or unexpected condition of the patient, or what? A. Well, not necessarily so. It should be that way. If everything had been done beforehand to determine a man's capability of taking an anæsthetic and, by all the rules that we observe we consider him a safe risk and then death would occur, why, I should say there is nothing more

that could be done, that it is unexpected. Q. Would that be due then to some condition of the patient that could not be determined? A. Well, I suppose it would. To be candid, I don't know. I suppose it would. Q. Then do you mean by that that you cannot tell what was the cause of death in this case except that he died while under the anæsthetic? A. He died an anæsthetic death. Now, why he died an anæsthetic death, I don't know. Q. Why do you say he died an anæsthetic death? A. Because he died of nothing else. Q. And that would be due to what? A. Do you mean other things he might have died of? Q. No, that he died an anæsthetic death? A. Because there was not any reason for the man to die and he did die that quick. The operation was done expeditiously, there was no hemorrhage, there was no shock. Ordinarily a kidney operation is an easy operation, and it was without any special technical difficulty and the man showed no evidence of doing badly from the operation. Why should he die? There was no bleeding and no rough manipulation to produce shock. I know he had no symptoms of shock. Now, why should he die? And he just died that quick. So it must have been an anæsthetic death. Q. Would that be due to some condition of the patient that you could not determine? A. Well, possibly so; I don't know. To be candid, I do not know. They are so rare that we don't get a chance to make much of a study of them, they occur so infrequently."

The court below in its opinion refusing to take off the nonsuit, stated it was the duty of plaintiff to show that something unforeseen, unusual, unexpected or unintended occurred during the operation, and that this something caused insured's death, and, further, that plaintiff had failed to meet this burden of proof.

Various definitions have been given of the word "accidental." In Hey v. Guarantor's Liability Indemnity Co., 181 Pa. 220, "accident" is defined as follows (page 224): "The definitions of an accident as given in the

Century Dictionary are, among others, as follows: '1. In general anything that happens, or begins to be without design, or as an unforeseen event. 2. Specifically, an undesirable or unfortunate happening; an undesigned harm or injury; a casualty or mishap.' In Bouvier's Law Dictionary, accident is defined as 'an event which, under the circumstances, is unusual and unexpected by the person to whom it happens. The happening of an event without the concurrence of the will of the person by whose agency it was caused; or the happening of an event without any human agency.' In Anderson's Law Dictionary, the following definitions of accident are given, with citation of authorities: 'An event or occurrence which happens unexpectedly from uncontrollable operations of nature alone, and without human agency; or an event resulting undesignedly and unexpectedly from human agency alone, or from the joint operation of both. An event from an unknown cause or an unusual or unexpected event from a known cause; chance, casualty.' A definition corresponding substantially with those quoted above may be derived from our own case of North American Life and Accident Ins. Co. v. Burroughs, 69 Pa. 43. The principle of that decision is that an accident is an unusual or unexpected result attending the operation or performance of a usual or necessary act or event."

A definition applied in the federal courts is found in Continental Casualty Co. v. Willis, 28 Fed. (2d series) 707, in which case it was held that death resulting from septicæmia caused by germs entering through an abrasion on the finger was accidental within the meaning of that term in a policy of accident insurance. The court discussed generally the question here involved and gave the following definitions of the word "accident" (page 709): " 'An effect which is the natural and probable consequence of an act or course of action is not an accident, nor is it produced by accidental means. It is either the result of actual design, or it falls under the maxim

that every man must be held to intend the natural and probable consequence of his deeds. On the other hand, an effect which is not the natural or probable consequence of the means which produced it, an effect which does not ordinarily follow and cannot be reasonably anticipated from the use of those means, an effect which the actor did not intend to produce and which he cannot be charged with the design of producing, ......is produced . by accidental means. It is produced by means which were neither designed nor calculated to cause it. Such an effect is not the result of design, cannot be reasonably anticipated, is unexpected, and is produced by an unusual combination of fortuitous circumstances; in other words, it is produced by accidental means.' Western Com. Travelers' Ass'n v. Smith, 29 C. C. A. 223, 85 Fed. 401, 40 L. R. A. 653, approved in Ætna Ins. Co. v. Brand (C. C. A. 2d), 265 Fed. 6 (13 A. L. R. 657).

"Mr. Justice BLATCHFORD, speaking for the Supreme Court of the United States, says: 'If a result is such as follows from ordinary means, voluntarily employed, in a not unusual or unexpected way, it cannot be called a result effected by accidental means; but if, in the act which precedes the injury, something unforeseen, unexpected, unusual occurs, which produces the injury, then the injury has resulted through accidental means.' Mutual Accident Ass'n v. Barry, 131 U. S. 100, 9 S. Ct. 755, 33 L. Ed. 60."

Although it is difficult to lay down a general rule for guidance in all cases, the foregoing definitions and their application in the decisions referred to, seem to support the following general conclusions:

First. An accident is an event that takes place without expectation whether it be from an unknown cause or from an unusual effect of a known cause.

Second. It is the cause and not the consequence which must be considered in determining the character of the event, and, however unexpected the result may be, it is

not accidental unless there was something unexpected in the cause or means which produced the result.

Third. The result must be such as is not the natural and probable consequence of the means which produced it and does not ordinarily follow and cannot reasonably be expected to follow from the use of those means, and a result which the actor did not intend to produce.

The exact point in issue here has not been decided in this state although the decision in Lane v. Horn & Hardart Baking Co., 261 Pa. 331, wherein it was held that a heat stroke suffered by a workman while performing his usual duties was an accident within the Workmen's Compensation Act, is very similar to the present. It was stated in the opinion (page 335) that: "The casualty was attributable solely to the unexpected and violent effect of the heat upon the physical structure of deceased's body; and this was properly held by the compensation board and the court below to be an accidental death within the meaning of the act."

See also the further statement in the opinion of above case (page 334) to the effect that cases cited were "illustrative of the liberal views entertained by the courts as to the meaning of the term 'accident' in determining liability for death or personal injury."

In Bloom v. Brotherhood Accident Co., 85 Pa. Superior Ct. 398, the insured, by reason of a mistake of a pharmacist in filling a prescription, died as a result of drinking poison. This was held to be an accidental death.

In Beile v. Travelers' Protective Ass'n of America, 155 Mo. App. 629, the assured died from the effects of the administration of chloroform by a physician preparatory to a surgical operation. The question whether death was accidental within the meaning of the policy was submitted to the jury, and a verdict rendered in favor of plaintiff. This verdict was set aside by the circuit court, but the court of appeals later reversed the circuit court and entered judgment on the verdict. It

there appeared the method adopted for administering chloroform was to gradually drop the anæsthetic on a mask placed over the patient's face. During this operation the patient died instantly, and before the operation had been begun. The testimony of the physician was to the effect that the subject's heart had been examined before administering the chloroform and he was found to be in first-class condition for the administration of the anæsthetic and for the operation. The cause of death was dilation of the heart due to the administration of the chloroform. In other words there was a hidden or unknown disease or condition of the heart which made the giving of chloroform dangerous to this particular person, and the result was one not to be anticipated in the ordinary course of events.

In Brown v. Continental Casualty Co., 108 So. 464 (Supreme Court of Louisiana), a physician died as a result of excessively inhaling chloroform, a narcotic he was in the habit of using to relieve headache and insomnia. The evidence indicated the overdose of chloroform was due to the fact that the doctor had fallen asleep while in the act of inhaling the liquid. The court held that death was due to accidental means, the element of unexpectedness being that deceased inhaled more chloroform than he intended or expected to inhale.

In Ætna v. Brand, 265 Fed. 6, a surgeon in closing the incision after an operation punctured with his needle an artery which was not in the place where usually found in a normal person, and, as a result, a blood clot formed which later resulted in death. It was held death was due to accidental means because the result was due to the fact that the artery was in a place where it ought not to have been.

A case almost identical with the present is Mutual Life Ins. Co. v. Dodge, 11 Fed. (2d series) 486, where death of the insured resulted from local administration of novocaine preliminary to an operation, the evidence being that death was due to the hypersusceptibility of

the insured to the drug. The court held death was due to accidental means because not the natural and probable consequence of the administration of novocaine and could not reasonably have been anticipated to follow therefrom. The Supreme Court of the United States refused a certiorari in this case: 27 U. S. 677. The same conclusion was reached under similar circumstances, in a carefully considered opinion by the Supreme Court of Minnesota: Taylor v. New York Life Ins. Co., 222 N. W. 912, 60 A. L. R. 959.

In Pope v. Prudential Ins. Co., 29 Fed. (2d series) 185, where death resulted from rupture of a vein following removal of clamps used during a kidney operation, it appearing the rupture was the result of a formation of the parts of the particular person and could not have been avoided by the exercise of skill or precaution; there was, however, evidence that the danger of such result was inherent in such operation. It was held the resulting death was not due to accident, that the insured or those acting with his consent did precisely what they intended to do and in the way which they intended, knowing that injury often did result and might be unavoidable, that there was no slip or misstep in the performance and no ignorance of any material factor which produced the result.

The logical conclusion from the definitions given above and their applications in the various jurisdictions, is that death in the present case was caused by accidental means. First, it was an unusual effect of a known cause, to wit, the administering of the anæsthetic preparatory to the operation. Second, the hypersusceptibility of the patient to the drug, which was unknown to him and his physician, was the unexpected feature of the cause (the administration of the nitrous oxide) which produced death. Third, the result was not the natural and probable consequence of the drug, but it was unusual and wholly unexpected and could not have been reasonably anticipated. It is true the insured assumed all the

usual risks and dangers incident to the operation. Had death resulted from shock, for example, though the surgeon performed the operation in a skillful manner and without slip or misstep in the performance, and with full knowledge of all natural factors, such death would have been a probable consequence which, though not intended or expected, was one of the usual risks attending major operations and consequently one which the patient was bound to anticipate might occur. The evidence here, however, is that the operation did not in any respect contribute to the result except, of course, in so far as it made necessary administration of the anæsthetic as a preliminary step; and while it is true such act was an intentional one performed in the usual manner, the unusual and unexpected feature of the case was the application of the anæsthetic, which it is conceded was as a rule harmless, to an individual who, unknown to the physician or the patient, had an idiosyncrasy or a hypersusceptibility to the drug,—a condition which was so rare and unusual that none of the doctors had observed it in his experience and which could not be predetermined by any known method. The result from such a cause was not a natural or a probable result of administering the drug, nor one which the patient was bound to anticipate, and was accordingly accidental.

This conclusion is not only in accord with the weight of authority in other jurisdictions, but also follows the general rule which holds that where there is a doubt as to the meaning of a clause in a policy of insurance, a construction most favorable to the insured will be adopted: Francis v. Prudential Insurance Co., 243 Pa. 380, 390; Krebs v. Philadelphia Life Insurance Co., 249 Pa. 330, 334. An examination of policies issued by accident companies indicates that where there is an intention to relieve from liability in cases such as this, an express provision against loss from surgical operations is inserted in the contract.

Having shown that death resulted from an accident, it remains to be considered whether it was brought about directly and independently of other causes through external and violent means. That the death was caused directly by the anæsthetic all doctors agree. There is ample authority for the conclusion that if the cause of the injury or death be shown to be due to accidental or unnatural means, this imports that it is also due to external and violent means, even though there be no actual external violence in the ordinary sense of the word. Thus the means have been held external and violent where death was due to inhalation of gas (Paul v. Travelers' Insurance Co., 112 N. Y. 472), to drowning (DeVan v. Commercial Travelers' Ins. Co., 92 Hun. 256, affirmed 157 N. Y. 690; U. S. Mutual Assn. v. Hubbell, 56 Ohio St. 516), to freezing (North West Commercial Travelers' Association v. London Guarantee Co., 10 Man. 537), to poison taken by mistake: Healey v. North Mutual Accident Association, 133 Ill. 556; North West Mutual Accident Association v. Tuggle, 39 Ill. A. 509. The same view was taken by this court in Pickett v. Insurance Company, 144 Pa. 79, where there was a claim for death which resulted from inhaling poisonous gas in a well into which the insured had descended to make repairs to a pump. It was held that death resulted from external and violent causes, notwithstanding an express provision in the policy that it should not cover death resulting from inhalation of gas, this provision being construed to mean a voluntary and intelligent act by the insured and not an involuntary and unconscious one. It was stated in the opinion of the court (page 91) : "As was well said in Paul v. Insurance Co., 112 N. Y. 472, which in principle rules this case: 'As to the point raised by appellant, that the death was not caused by external and violent means, within the meaning of the policy, we think it a sufficient answer that the gas in the atmosphere, as an external cause, was a violent agency, in the sense that it worked

upon the intestate so as to cause his death. That a death is the result of accident, or is unnatural, imports an external and violent agency as the cause.' ......

"The cause of death came from outside, as surely as would a rifle ball, or water in the case of drowning. The escape of gas into the room was violent, in the same sense that would be the flow of water into a wrecked vessel. In either case, the external means constitute the cause which produces death."

In Bloom v. Brotherhood Accident Co., 85 Pa. Superior Ct. 398, it was held that death due to a mistake in taking a poison instead of a drug which deceased intended to take, resulted from external and violent means.

The only remaining question is whether death resulted from the cause alleged, independently of other causes. In the majority opinion of the court it is stated that the injuries were not effected by the administering of the drug independently of all other causes, but that the cause was hypersusceptibility to a particular anæsthetic. This same reasoning, however, might be applied to the case of any injury which produces a result depending to some extent upon the physical condition or peculiarities of the person on whom the injury is inflicted. If, for instance, the individual had a latent disease or a weak heart an injury to such person might prove fatal, although in the case of an ordinary person it would not necessarily or even probably produce such result. In all such cases, applying the rule stated in the majority opinion, the question whether the injuries resulted from the blow independently of other causes would depend upon proof of the physical condition of the person rather than upon the nature of the injury. What seems to be the proper rule was stated in the case of Kelley v. Pittsburgh Casualty Co., 256 Pa. 1, where plaintiff was injured by twisting his body in an unusual position in endeavoring to avoid a fall on slippery ground. It appeared plaintiff was afflicted with intestinal adhesions which, according to medical testimony, made the result possible,

and but for the existence of such adhesions the injury would not have resulted; or, stated conversely, had it not been for the accident, the adhesions would never have inconvenienced plaintiff. In the opinion of the court below, which was affirmed by this court on appeal, sustaining a verdict for plaintiff, it was said (page 6) : " 'If disease, while existing, be but a condition and the accident the moving, sole and proximate cause of the death, the exception in the policy will not relieve the insurer for death so caused......' [Page 7:] The fact that the physical infirmity of the victim may be a necessary condition to the result does not deprive the injury of its distinction as the sole producing cause. In such case, disease [and] low vitality do not arise to the dignity of concurring causes, but, in having deprived nature of her normal power of resistance to attack, appear rather as the passive allies of the agencies set in motion by the injury...... Where accidental injury aggravated a disease, and thereby hastened death so as to cause it to occur at an earlier period than it would have occurred but for the accident, it is the direct, independent, and exclusive cause of death at that time...... The phrase 'resulting directly, independently, and exclusively in death,' refers to the efficient, or, as some courts speak of it, the predominant cause of death at the time it occurs. In other words, it means the proximate cause. ......It must be remembered that the policy is couched in language, chosen by the insurer, and must be given the construction, of which it is susceptible, most favorable to the assured...... Moreover, it is the duty of courts to give such construction to a policy, if the language used fairly admits, as will make it of some substantial value and carry out the intention expressed therein that liability is incurred where death occurs from accidental injury. If liability is to depend upon the physical condition of the assured as contributing in some degree to death, then it should be so stated plainly in the policy. We are of the opinion that the language

of this policy does not mean that there shall be no liability in case death results from the aggravation of a preëxisting disease."

In the present case, the majority opinion states that the effective cause was the hypersusceptibility of the deceased to the particular drug. The obvious answer is that without the administering of the drug this latent susceptibility would never have harmed the insured, just as latent tuberculosis germs may exist in the human body without causing harm until a blow or injury arouses them into activity. The opinion of the court also states defendant did not insure against loss resulting from such hypersusceptibility of the insured. This same statement was, in our opinion, effectively answered in Kelley v. Pittsburgh Casualty Co., supra, by saying that the policy contained no clause limiting liability when the result of an accident is aggravated or contributed to by disease or bodily infirmities or peculiarities.

The majority opinion would adopt a rule limiting the liability of insurance companies to loss only under such circumstances as are expressly covered by a clause in the policy, whereas the rule universally applied is that, in absence of limitation in the policy, liability exists in all cases falling within its general provisions, and the burden is on the insurer to point to a clause exempting it from liability. There is no clause in the present policy, at least none appears in the part printed in the record, limiting liability to only such accidents, the result of which are in no manner affected by the presence of bodily ailments or idiosyncrasies, or such accidents as happen to persons who are physically sound and normal. It would be practically impossible to conceive of a serious injury to the body, the result of which is not in some manner contributed to by the age, physical condition or even mental attitude of the victim toward his injuries. Under the majority opinion an accident insurance company would no doubt be able to show in many cases, by

expert testimony, the existence of a contributing cause which helped produce the result, and thus escape liability. In my opinion the only logical construction is to hold that, in absence of an express provision in the policy, the doctrine of proximate cause must be applied and if the external force was the proximate cause of a specific result it is immaterial that a bodily condition or ailment existed which contributed in some measure to the result, or made the result possible.

I would reverse the judgment of the court below.

Mr. Justice KEPHART and Mr. Justice SADLER concurred in this dissent.