### ÆTNA LIFE INS. CO. v. YOUNG.
#### No. 6852.

Circuit Court of Appeals, Third Circuit.
March 29, 1939.

Paul Reilly, of Philadelphia, Pa., for appellant.

Thomas E. Comber, Jr., of Philadelphia, Pa., for appellee.

Before BIGGS, MARIS, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

Although we feel constrained to reverse the judgment of the learned District Court, we are fully aware of the vexing character of the question presented to it. We think it a pity that neither counsel, if we are to judge from their briefs, seem to have been conscious of the illuminating opinion of the Circuit Court of Appeals for the Eighth Circuit reported sub nomine, Preferred Accident Ins. Co. of New York v. Combs, 76 F.2d 775. We believe that the presentation of that opinion to the learned District Judge would have been of as much assistance to him as it has been to us. The facts raising the problem which has puzzled us and our judicial brethren are of common and sad occurrence. This is borne out by the all too numerous reported cases. We found the decision we have just cited particularly helpful.

The decedent, sales manager of Madeira Hill & Company, and a man of sixty years, spent the evening before his death at his office with his assistant on matters concerned with the 77B reorganization of his employing company. On his way home, at 1:30 in the morning, his car was heard to strike a car parked on the side of the road, damaging it to the extent of fifty-eight dollars. He did not get out, but continued on his way home. At 9:45 the same morning, Mr. Young called on the owner of the other car at the Philadelphia Country Club and discussed the accident with him. He went from there to his own garage on Broad Street to see about repairs to his own car (renewal of the right front fender and replacement of the hub cap) and then returned home. He was in great pain when he arrived at home and when his hastily summoned family physician arrived, he was dead.

The plaintiff-appellee alone offered medical testimony. She called three doctors, the family physician who prepared and filed the death certificate, a surgeon employed by counsel to perform an autopsy, and a heart specialist. They agreed that a condition known medically as atheroma had resulted in a deposit of calcium (lime salts) on the wall of the anterior coronary artery and that its interior diameter (lumen) had been correspondingly narrowed (1 mm.). They said further that a blow postulated by a bruise on decedent's chest had acted on the friable artery walls in such a way as to fatally occlude the narrowed lumen by a clot or thrombosis.

In the view we take of the case it is not necessary for us to concern ourselves with, or comment upon, the respective attorneys' efforts to put their own words of art in the mouths of their medical brethren. Plaintiff-appellee's expert, very fairly as we thought, summed the matter up by saying:

"Q. On the evidence we have here; but in your opinion, or your theory is that that blow upon the chest combined with the condition of the coronary arteries of the heart brought about Mr. Young's death? A. Yes, I think the blow on the chest and the condition of the artery were both factors." Record, p. 138

"Q. I didn't say precipitating factor, I say combined to cause it. For instance, let me ask you this, the blow upon the chest that you have talked about without the heart condition would not have caused death, would it. A. I would—I think not." Record, p. 137

By the same token, it is unnecessary, fortunately, for us to consider the medical theory propounded. An examination of some medical text books does give the impression that the narrowing of the orifices of the coronary arteries is followed by nutritive impairment of the cardiac muscle, fatty degenerative changes, and then, and not until then, anginal attacks, Allbutt, Diseases of the Arteries, p. 17; Fishberg, Hypertension and Nephritis, p. 198.

We cannot give our approval to the language used by the trial judge in charging the jury. He seemed under the impression that the participles, precipitating and predisposing, had been used by the defendant insurance company to define its liability. He accordingly prescribed them for the guidance of the jury. The fact is that the clause of obligation is the one found in the majority of the so-called double indemnity accident policies and the adverbs used are directly, indirectly, independently and solely. They have no anal-

ogy to the medical terms lifted by the learned trial judge from the mouth of the heart specialist called by the plaintiff-appellee. In stressing them in his commendable effort to enlighten the jury in their solution of the perplexing problem presented, we think he committed error. We cannot fit the use of these particular participles to any one of the three theories expressed in the controlling authorities. So finding, it is unnecessary for us to declare a preference. As an appellate court whose services may again be sought, we think it useful to go beyond the salutary rule of limited decision in three respects. Any further consideration of this case should concern itself, first, with the selection of the soundest of the legal theories hereafter adverted to, second, a proper interpretation of the word disease as applied to the physical condition of the insured, and third, the causal relation between the accident and the death.

The judge speaking for the court in the case referred to at the beginning of our opinion, commences the appropriate part of his decision with the following paragraph: "The difficult question presented on this appeal arises out of the question whether or not the insured's sclerotic condition as a matter of law deprived plaintiff of a right to recover under the policy in the absence of evidence that Combs suffered an accident which would have caused his death in spite of that condition. It is a question, indeed, with respect to which the decisions of courts have not been uniform. Proximate cause, remote cause, reasonable interpretation, intention of the parties, have been included in the terms that have been considered in treating the subject. This inharmonious state of the authorities has been judicially recognized". Preferred Accident Ins. Co. of New York v. Combs, 8 Cir., 76 F.2d 775, 779. The lack of harmony of which he speaks has divided the cases, like Gaul, into three principal divisions.

The slight weight of authority holds that as a matter of law where the accident aggravates the disease, or the disease aggravates the consequences of the accident, there can be no recovery. Under this view there could be a recovery, where the disease contributes to the injury or death, only if the accidental means is so violent or far reaching that it would have brought about the same result as a natural consequence, without the aid of the disease, but possibly at a later time. A directly contrary view is expressed by those cases permitting recovery as a matter of law on a showing that the disease alone would not have caused the result at the time it did occur, although the result of death is hastened thereby. Some courts refuse to follow either of these extremes but take a middle position. They borrow from the law of negligence and leave it to the jury to decide whether the disease or the accident is the proximate cause of injury or death. In so doing they sprinkle their opinions freely with such participles and adjectives as producing, predominating, efficient, passive and remote.

As we are expressing no preference, we do not intend to encumber this opinion with the actual citations. They can be found cited and discussed in number equal to the leaves of Vallambrosa in four excellent law review notes, Insurance—Preindisposition as a Contributing Factor under an Accident Policy, 26 Illinois Law Review 344; Insurance—Accident—Disease Excepted from Liability, 25 Michigan Law Review 467; Insurance—Accidental Injury and Pre-existing Disease Concurring in Causing Death, 25 Michigan Law Review 803; Insurance—Accident Insurance—Death by Injury Acting on Pre-existing Disease or Latent Weakness as Constituting Death by Accidental Means, 19 Minnesota Law Review 244, and, from the insurance company point of view, in a book entitled, "Accidental Means", by Martin P. Cornelius.

The Pennsylvania decisions, although not conclusive, incline in the direction of what we have referred to as the slight weight of authority, Hesse v. Travelers Ins. Co., 299 Pa. 125, 149 A. 96; Ewing v. Equitable Life Assur. Soc. of U. S., 320 Pa. 577, 182 A. 369. See also Maryland Casualty Co. v. Morrow, 3 Cir., 213 F. 599, 52 L.R.A.,N.S., 1213 (of less interest since Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487). In the Ewing case, above cited, the court dealt with testimony phrased in the terms, precipitating and predisposing. In discussing the Hesse case, above cited, a writer in the University of Pennsylvania Law Review has this to say: "It is undoubtedly true that, inasmuch as the insurance company's legal and technical experts have drawn up the contract, justice to the insured demands that, in accordance with well-recognized contract principles, the

policy be construed most favorably to him. However, this alone cannot warrant the position taken by those courts which 'look to the result rather than the means either because of a neglect to differentiate clearly between the two, or a refusal to do so. If it is desired, out of sympathy for the insured or in an attempt to give to the words in the policy the meaning attached to them by the average policyholder, to reach this result, it may be done just as effectively and with fewer confusing consequences by means of statutes clearly setting forth type forms of insurance policies and stating the legal signification attaching to them. It must be remembered, however, that from the viewpoint of social utility, the effect of a too liberal construction of the insurance policy would be offset by the consequent prohibitive cost of such protection. This being so, proper judicial appreciation requires that the contractual nature of the policy should be the controlling factor." Rationale of "Accidental Means", 78 University of Pennsylvania Law Review 762, 771.

We think that part of the confusion apparent both in the court below, and in other courts, may arise out of a failure to emphasize properly the function of the policy word disease as applied to conditions of senescence. As Chief Justice Cardozo has trenchantly observed: "A policy of insurance is not accepted with the thought that its coverage is to be restricted to an Apollo or a Hercules." Silverstein v. Met. Life Ins. Co., 254 N.Y. 81, 171 N.E. 914, 915. And amplifying the same subject, the Court, from which we have already quoted, says: "Although the 'processes of life and of death are still, in their essential nature, unfathomed mysteries,' Aetna Life Ins Co. v. Allen (C.C.A.1) 32 F.2d 490, 493, we do know that because man lives, he must grow old. His hair greys; lines in his face appear; his senses become less acute; his ability to endure and to achieve decreases. But because one cannot participate in sport with the vigor of two decades earlier, because he cannot ascend and descend stairs with the energy of former days, because he is more susceptible to winter ills and less resistant to the ailments of the body, does not mean that one is 'diseased' within the meaning of an accident policy. Such policies are issued to people of different ages just as they are to people of different physical abilities. To have them means anything,

therefore, the protection they afford the insured must not be defeated by those expected and normal physical changes that inevitably come to all men." Preferred Accident Ins. Co. of New York v. Combs, 8 Cir., 76 F.2d 775, 781.

Whether the condition of the arteries relative to age is so abnormal as to be diseased, may well be for the jury. It is interesting to recall that the earliest recorded instance of an autopsy is one performed by Leonardo da Vinci in order to ascertain the cause of "so gentle a death" of a venerable man in whose veins he found calcifications as big as chestnuts, Anatomical MSS. A and B. in Windsor Castle Library, published by Theodor Sabachnikoff, Paris 1898 and Turin 1901.

Plaintiff-appellee's chain of causation is: an automobile collision, a "vague bruise slightly to the right side of the chest (Record p. 105), a tube lying directly behind the chest wall; and broken spicules (small hard bodies) in that tube" (Record, p. 107). The exact legal nature of appellant's attack on this chain does not clearly appear from its citations and argument. It seems to waver between two theories and possibly to advocate both. The first theory happens to be out of date. Originally Pennsylvania was one of the several jurisdictions prohibiting an inference on an inference. In Neely v. Provident Life & Accident Insurance Co., 1936, 322 Pa. 417, 185 A. 784, its Supreme Court reversed the earlier cases without mentioning them, 11 Temple Law Quarterly 255 (note). The learned Justice writing the opinion quoted with approval Professor Wigmore, long an opponent of the double inference rule. 1 Wigmore on Evidence (2d Ed.) Sec. 41 P. 258. Its lack of logic is fully explained by the learned Professor and the author of the law note above cited.

The second ground of attack is based upon the exclusion of other possible causes. In the trial below the jury were allowed to infer a causal connection between an automobile collision and a vague bruise on the chest of the driver of one of the cars involved. Furthermore, the testimony as to the bruise was that of the doctor performing an autopsy twenty days after the accident. It would not be proper to speculate now upon a causal connection which must depend upon the interpretation and application of facts developed at a later time. We confine ourselves therefore to

suggesting an examination of the following cases, Welsh v. R. Co. 181 Pa. 461, 37 A. 513; Bruggeman v. York, 254 Pa. 430, 431, 98 A. 970; Walters v. Federal Life Insurance Co., 320 Pa. 588, 184 A. 25.

The judgment of the District Court is reversed and a new trial ordered.