# CASES

IN THE

# SUPREME JUDICIAL COURT

OF THE

## STATE OF MAINE

---

LIDA M. THOMPSON

*vs.*

COLUMBIAN NATIONAL LIFE INSURANCE COMPANY.

Knox.   Opinion September 1, 1915.

*Accident Insurance Policy.   Exceptions.   Experts.   Immediate Cause of Death.   Rupture of Heart.*

1.  If an accident causes blood poisoning, and the blood poisoning causes death, the death is the direct result of the accident, and liability is established under an accident insurance policy which limits liability to death in consequence of the policy "independently and exclusively of all other causes."

2.  An issue being whether a slit in the muscles of a human heart was a rupture caused by violence before death, or a cut made after death, it is within the discretion of the presiding Justice to permit or refuse to permit, the exhibition of the heart itself to the jury.   And unless the discretion is abused exceptions do not lie.   In this case it does not appear that the discretion was abused.

3.  It does not clearly appear that the verdict for the plaintiff was wrong.

On motion and exceptions by the defendant.   Motion and exceptions overruled.

This is an action on an accident insurance policy issued by defendant to Warren Thompson, which, in case of his death, was payable to his wife, the plaintiff.

Plea, the general issue. The jury returned a verdict for plaintiff. The defendant filed a motion for a new trial and had various exceptions, all considered in the opinion.

The case is stated in the opinion.

*A. S. Littlefield,* for plaintiff.

*Symonds, Snow, Cook & Hutchinson,* for defendant.

SITTING: SAVAGE, C. J., SPEAR, KING, BIRD, HALEY, JJ.

SAVAGE, C. J. Action upon an accident insurance policy. The verdict was for the plaintiff, and the case comes before this court on defendant's exceptions and motion for a new trial. The plaintiff claims that her husband, the insured, received bodily injuries through accidental means in consequence of which he died. The defendant claims that the insured did not die in consequence of the accident "independently and exclusively of all other causes," as the policy phrases it. This present the issue of fact.

MOTION. The assured was mate on a steamer plying between Portsmouth and the Isle of Shoals. The evidence would justify a finding that on one trip in August, 1913, on a rainy day, when the boat was making a landing, the insured slipped on the wet deck, or lost his balance, while throwng a heaving line, and fell heavily to the deck. His weight was about 200 pounds. Apparently before this time he had been a well man. After this and until his death some days later, he complained of pain in his left side. He continued to work, but when not at work lay in his bunk. Sunday, August 31, he appeared to be worse, and lay in his bunk practically all day, and hot cloths were applied to his left side. That evening he went to a hospital, where he died the next morning. At the hospital it was discovered that he had a black and blue spot as large as the palm of a man's hand in the region of the heart, and one on the hip. He was weak and distressed for breath. Being turned in bed from his right side to his left, a few minutes before death, his breathing changed, and indicated impending death. The physician at the hos-

pital diagnosed the case as one of typhoid, but it is now conceded that such was not the fact.

Two autopsies were had, one October 8 at the instance of the plaintiff, and another October 10, for the defendant. The physicians who made the first autopsy say that they found signs of ecchymosis or settling of the blood over the pericardium, that is, in the heart region; that the discoloration covered an area about the size of the hand; that there was ecchymosis and discoloration about the tissues over the heart corresponding with the discolored area on the outside; that it continued in to the ribs; that upon opening the thoracic cavity, it was found that there was more or less congested and inflammatory appearance all the way to the pericardial sac; that the same was true of the chest walls; and that the tissues of the outer layer of the pericardium looked congested and red. On the other hand, the physicians who conducted the second autopsy say they discovered no signs of inflammation extending from the exterior to the heart.

At the first autopsy, the pericardial sac having been opened, the witnesses say a small quantity of watery blood was found in the sac, and on the surface of the left ventricle, a slit or rupture of the muscles, three-quarters of an inch long, from which a small clot of blood oozed out, when the heart was lifted. But the rupture did not penetrate to the cavity of the ventricle. At the second autopsy, the defendant's physicians say they found no blood in the sac, which perhaps is not surprising in view of the fact that the sac had been opened two days before; and they say further that they found a cut into the heart muscles over three inches long, and one-half inch deep in places. The difference in the length and the depth of the cut as developed in the two autopsies seems to have been a matter of discussion at the time, the plaintiff's physician who had made the autopsy, then present claiming the condition was changed.

The plaintiff contends that the heart was ruptured before death in consequence of the fall, and that the rupture was the immediate cause of death. And there is medical testimony that such a consequence might follow a fall. But the defendant contends that the heart muscles were cut, and that the cut was made after death. It is not claimed that the cut was made, even accidentally, when the pericardial sac was cut open at the first autopsy. So far as there is

any evidence on that question, it is all to the effect that the cut in the sac was at right angles with the line of the rupture. The defendant's experts testify that in their opinion the cut was made by the undertaker's trocar, or embalming tube, the beveled edge of which, it is claimed, constitutes a sharp instrument. The jury saw the instrument and could judge whether it was capable of making such a cut as the one described. There is a reason why the jury may have concluded that this theory of the experts was wrong. They might not have been able to see how a trocar, inserted, as the undertaker in this case says it was, between the third and fourth rib on the right side of the sternum, and pushed in until it reached the heart, could make a cut on the exterior of the left side of the heart. We ourselves are troubled to see how.

The defendant's experts all express the opinion that the man died of acute blood poisoning, from an infection caused by the germ pneumococcus. They say there had been an inflammation in the left pleura, causing adhesions, for which this germ is ordinarily responsible, and that the consequences of the infection caused by this germ were manifest in the condition of the liver, spleen and other organs as they found them. And they say furthermore that the adhesions in the pleura indicated that the inflammation there must have existed prior to the accident, upon the assumption that the accident was six or seven days before the death. It may be noted, however, in this connection that the time of the accident is left indefinite by the witnesses. One says it was "a few days before the death," and "I think about a week; between a week and ten days." Another says, "I guess it was about a week or ten days before it was time to haul up." And the time to haul up was September 2, the day after Mr. Thompson died. Evidently the length of time is too uncertain and indefinite to serve as the basis of a definite conclusion that he had pneumococcic inflammation before the accident.

In reply to the defendant's general contention the plaintiff says that even if the immediate cause of death was blood poisoning, yet if the blood poisoning was superinduced by the physical effects of the fall upon Mr. Thompson's body, as she says, from the defendant's evidence, it may have been, his death, within the meaning of the language of the policy, resulted "directly from the accident independently and exclusively of all other causes." And we think it

would be so.  If an accident caused blood poisoning, either external or internal, and the blood poisoning causes death, the death is the direct result of the accident.

We have thought best to state the issues at some length.  But it will serve no good purpose to discuss the evidence in detail.  The mere statement of the case shows that the questions to be determined were purely those of fact.  The ascertainment of the truth depended largely in the first instance upon the physical condition of Mr. Thompson's body, and especially of his heart, at the time of his death. And from the testimony on the one side and the other, different inferences may be drawn.  What was the cause of death depended much upon the correctness of the views of expert physicians.  And the views of the physicians were as expressed diametriacally opposed. We have examined the evidence with painstaking care, in the light of the arguments of the learned counsel, and it suffices to say that we are not convinced that the verdict was wrong.  On the other hand there is credible evidence to support it.  The motion for a new trial must therefore be overruled.

EXCEPTIONS.  The defendant offered in evidence the heart of Mr. Thompson itself.  It was excluded.  The defendant contends that as the prime question at the trial was whether there was a rupture of the heart before death, or a cut upon the heart after death, the heart itself would be the best evidence of the truth.  It would be good evidence, it must be conceded, if the heart remained in the same condition as it was at death, and would be properly admissible, if the jurors, who were non-experts, were competent to judge of a question, the answer to which must depend to a considerable degree upon expert knowledge.

Whether demonstrative evidence of this character should be admitted depends, within well defined limits, upon the discretion of the presiding Justice.  And unless the discretion is abused, exceptions do not lie.  Ordinarily a preliminary question is whether the thing offered is in substantially the same condition it was at the time in question.  The determination of this fact is for the Justice, and to his finding exceptions do not lie.  This is so well settled that the citation of authorities is unnecessary.  In this case the Justice in excluding the heart gave no reason.  We must therefore inquire whether there was any good reason.  We think there was.

It is complained that he excluded the heart without examining it himself. But he had listened to reams of testimony about it. It is evident that there was a bona fide dispute as to whether the heart was in the same condition as to the rupture or cut at the time of the trial as it was at the first autopsy. If the Justice believed the witnesses for the plaintiff he was authorized to find that the condition was changed. And we cannot revise his finding on exceptions. Besides, the length of time that had elapsed since the body was exhumed and the susceptibility of matter of that kind to decay and degeneration may have led him in the exercise of a wise discretion to withhold it from the jury, even though there was testimony that it had been "scientifically preserved," and had not degenerated. Again, it admits of serious doubt whether non-experts are in a condition to judge a year and a half after death whether a slit in a human heart was caused by a rupture before death or by a cutting after death. If not, then such demonstrative evidence is not proper to be submitted to a jury of non-experts. We suggest this question. We have no occasion now to decide it. We think the exceptions are not sustainable.

*Motion and exceptions overruled.*