## ÆTNA LIFE INS. CO. v. ALLEN et al.

Circuit Court of Appeals, First Circuit. April 9, 1929.

No. 2295.

Morris, District Judge, dissenting.

William B. Mahoney, of Portland, Me. (William H. Gulliver, of Portland, Me., on the brief), for appellant.

Carl C. Jones, of Portland, Me. (Bradley, Linnell & Jones, of Portland, Me., and Percy T. Clarke, of Stonington, Me., on the brief), for appellees.

Before JOHNSON and ANDERSON, Circuit Judges, and MORRIS, District Judge.

ANDERSON, Circuit Judge. The main question before us is whether the insurance company was, on all the evidence, entitled to directed verdicts. In 1925 the appellant issued to Arthur N. Dority an accident policy, and an automobile supplement, insuring Dority, "subject to the provisions, conditions, and limitations herein contained, against loss resulting, directly and independently of all other causes, from bodily injuries effected during the term of the policy solely through accidental means as follows": For loss of life, $6,000 under the original policy, payable to his estate; and under the automobile supplement, while riding in a private automobile, a like sum payable to his mother, the plaintiff in the second suit.

Dority was the owner and manager of an automobile salesroom and garage in Ellsworth, Me. He was a strong, healthy man, 37 years old, weighing about 180 pounds, and had never been ill. On September 3, 1927, while riding in the rear seat of an automobile about 11 o'clock at night, the car was tipped over toward the left, breaking the glass and wrecking the body. He was thrown against the side of the car, bruising his shoulder and pushing his arm violently against his left side and (in some way not shown) spraining his right wrist. The next morning he sent for a local doctor, told him of the accident, and wanted his shoulder examined, "to see if he had broken any bones." The doctor testifies that "his left shoulder was swollen and showed black and blue on the point of the shoulder. * * * He complained of some pain in his side, underneath his shoulder and arm. * * * He said, when the car tipped over on the side, he went over against the side of the car and hit his arm, and pushed the arm against the side—as near as he could explain the reason for the trouble in the side." His temperature was then 99 degrees. On September 6 "the shoulder was still lame and swollen. He complained of the pain in his side, and under the shoulder blade. * * * He seemed nervous. * * * He was uneasy." On September 9 "his shoulder was swollen more, and he complained of more pain; he was more nervous and restless." On September 14 "he complained of much more pain in his shoulder. The shoulder was swollen more, and he said he felt mean all over. * * * He could not get up to

dress himself, and it was hard for him to feed himself with it; to use that arm. Why, he seemed to be much more nervous at that time. He couldn't collect himself so much. He said he felt chilly, and sweat nights some." His temperature was then 102.

In the light of the event—death—and of the experts' theories, this evidence that he had chills and night sweats before September 14 becomes of much significance. A little later the night sweats were so severe that "you could almost wring water out of his night clothes." He lost about 20 pounds in weight. He was weak. "He seemed to be going down hill." The right wrist swelled badly. His doctor was puzzled about the case.

In short, the evidence warrants, perhaps requires, a finding that from the time of the accident on September 3 until his death on October 30, he was progressively a very sick man. The attending physician testified that in his opinion the cause of his death was "heart trouble, following the injury"—from "the automobile accident." On the day of the death the absence of his physician led to calling in another doctor, who, not familiar with the history of the case, certified the cause as broncho-pneumonia; apparently not an unreasonable diagnosis on the symptoms then obvious.

There was evidence that the insurance company denied liability, but demanded on December 21, 1927, the exhumation of the body and an autopsy. This was agreed to, and took place on January 16, 1928, 11 weeks after the death. The body had not been embalmed; when exhumed, the face was covered by mould. The autopsy disclosed evidence which, in the general opinion of the doctors, tended to show that the *immediate* cause of Dority's death was acute endocarditis, or inflammation of the lining of the aortic valve of the heart.

The case then became a battle of experts —five, besides the attending physician. In general, the experts for the appellant attributed the death of Dority to a bacterial infection, possibly originating in one tonsil, in which were found "two crypts" containing "a yellow pus-like material," which (as defendant's experts said) happened coincidently or subsequently to the accident to get into the blood stream and thus to the heart, with fatal results. The plaintiff's experts doubted this theory, as the so-called disease of the tonsils was nothing but the common condition of tonsils in a healthy man, at most an inactive disease; they argued that, assuming infection, it might have come from

the teeth (which were not examined), or from a sinus, the middle ear, the colon, the bladder, etc. The answer of one expert on cross-examination may fairly be said to sum up many pages of their theorizing: "We have no actual proof of what did actually occur there."

This statement as to what was ascertained by an autopsy on a body exhumed 11 weeks after death is highly credible, and may well have influenced the jury in their finding that the real cause of Dority's death was the accidental injury suffered on September 3. The lengthy and conflicting views as to "traumatic endocarditis," "traumatic neurosis," "ulcerative endocarditis," "rheumatic endocarditis," "neuritis," "psychic shock," etc., in connection with Dority's progress toward death, may have seemed to the jury to bear little or no relation to the issue of fact submitted to them. This is in effect admitted by the greatest of our modern medical scientists, whose modesty in describing what they do *not* know is at least equal to their just pride in the great achievements of their profession during the last 50 years. There was not even expert agreement as to bacteria being the means or immediate cause of the death. The defendant's leading expert, the medical examiner, testified:

"Then, September 12th to 14th started the new picture of the œdema, the swelling of the shoulder and of the hand; that represented, as I have tried to explain, either a delivery of toxins from a focus or a delivery of bacteria. I don't know which."

"X-Q. 57. Well, if it was a delivery of bacteria, in your opinion whether or not that was the same bacteria that caused the endocarditis?

"A. I am inclined to believe they were, if they were bacteria. On the other hand, I am inclined from recent work, showing the production of toxins by this group, to attribute it probably to the delivery of toxic products, rather than bacteria. The work with reference to this is confusing," etc.

The weight (or lack of weight) of all this theorizing was for the jury.

We turn now to the appellant's main contention—for directed verdicts, on the ground that it conclusively appeared that Dority died of bacterial infection, and that the appellant is let out by the following condition or limitation in the policy:

"C. This insurance shall not cover accident, injury, disability, death, or other loss caused directly or indirectly, wholly or partly, by bodily or mental infirmity, ptomaines,

bacterial infections (except pyogenic infections which shall occur simultaneously with and through an accidental cut or wound), or by any other kind of disease."

For present purposes, the crucial word in this condition "C" is "caused."

The court instructed the jury:

"Now, if it should happen, in any case of death under an accident policy, that there was a disease present, and also an accident, and if the disease—if the accident aggravated the disease, and the death was due to both combined, there can be no recovery because the policy says the company is liable only as a result of an accident. If it occurred partly or wholly in connection with any disease, the company is not liable."

He read from the Shryock Case (C. C. A.) 73 F. 774, cited to him, and relied upon by the defendant:

"The burden of proof was upon the defendant in error to establish the facts that William B. Shryock sustained an accident, and that that accident was the sole cause of his death, independently of all other causes. If Shryock suffered such an accident, and his death was caused by that alone, the association agreed by this certificate to pay the promised indemnity. But if he was affected with a disease or bodily infirmity which caused his death, the association was not liable under this certificate, whether he also suffered an accident or not. If he sustained an accident, but at the time it occurred he was suffering from a pre-existing disease or bodily infirmity, and if the accident would not have caused his death if he had not been affected with the disease or infirmity, but he died because the accident aggravated the effects of the disease, or the disease aggravated the effects of the accident, the express contract was that the association should not be liable for the amount of this insurance. The death in such a case would not be the result of the accident alone, but it would be caused partly by the disease and partly by the accident, and the contract exempted the association from liability therefor."

"'If the death was caused by a disease which was not the result of any bodily infirmity or disease in existence at the time of the accident, but which was itself caused by the external, violent and accidental means which produced the bodily injury, the association is equally liable to pay the indemnity. In such a case the disease is an effect of the accident, the incidental means produced and used by the original moving cause to bring about its fatal effect, a mere link in the chain of causation between the accident and the death, and the death is attributable, not to the disease, but to the causa causans,—to the accident alone.'"

"Those two quotations are taken from cases submitted to me by the defendant, and I regard them as correct statements of the law. Now to apply them in this case: Here we have the disease that caused this man's death. If that disease was solely caused by the accident the company is liable. If that disease was not solely caused by the accident the company is not liable. So it brings us right back to the condition before the occurrence of the disease. The doctors agree that that is an infectious or germ disease."

It will be noted that these instructions assume that the immediate cause or occasion of Dority's death was a bacterial infection from some source. After appropriate caution that all questions of fact were for the jury, whatever opinion thereon the court might express, the judge stated his disagreement with the argument of plaintiff's counsel that the "testimony of the layman is to be relied upon so much here, in contrast with that of the doctors." But we think the jury were, as already noted, at liberty to disregard the conflicting and highly speculative theories of the experts, and to conclude that the causa causans of the death was the accident, effecting its fatal result in undetermined ways. It cannot be denied that the processes of life and of death are still, in their essential nature, unfathomed mysteries; that health and sickness are phenomena, the causes of which frequently remain unknown. The jury knew that Dority was hurt and died; they were warranted in finding that the hurt was the cause of his death, without also finding that the theory of bacterial infection, as a link between the hurt and his death, was established.

The court's plain ruling that the plaintiff could not recover unless the accident was the sole cause of death, independently of all other causes, was, after the main charge, at the defendant's request, repeated as follows:

"If you find that at the time of the accident Arthur N. Dority was suffering from chronic tonsilitis, or had in his body a focus of infection of the type which would cause the ulcerative endocarditis, and you find that the accident would not have caused his death, but for the existence of the chronic tonsilitis or other focal infection, then the plaintiff cannot recover.

"If you find that at the time of the accident Arthur N. Dority was suffering from a focal infection, and the effect of the accident and the focal infection together contributed to his death, then the plaintiff cannot recover. I will explain further in regard to that, which I suppose is understood thoroughly by you, that infection as an independent cause of death is not covered by that accident policy, unless the infection came through a cut or wound in the body. But so far as I know there is no evidence here making that applicable. There is no claim here that an infection came through a cut or wound in the outside of the body. There is a claim that that bacteria came from a certain source and attacked the heart, and it was caused to do so by the accident. Now the fact that bacteria was present as one of a chain of circumstances doesn't except the defendant from liability if it was entirely caused to have that effect by the accident.

"The plaintiff is required to satisfy you that as a matter of reasonable probability the death resulted from accidental causes as defined in the policy, and it is not sufficient if the evidence relating to the cause of death results only in conjecture, and I instruct you that testimony as to the possibility of death being caused by the accident is not sufficient to warrant a verdict in favor of the plaintiff. The plaintiff must satisfy you that as a matter of reasonable probability the death resulted solely from accidental means within the meaning of the language in the contract, as I have defined to you. No question about that."

■■ These repeated instructions fully covered the defendant's rights. To rule, as the defendant requested, that the policy did not cover death from accident, if a bacterial infection was one link in the resultant chain drawing the victim to his death, would fall little short of nullifying the death clause of the contracts. "Caused" as used in the condition C, supra, means no more than the language in the main clause, supra, "resulting directly and independently of all other causes," etc., in death. The instructions excluded death from any *cause* except the accident. To go further and instruct the jury, as the defendant in effect requested, that possible bacterial infection was a step between the causing injury and the resultant death, would transmute mere conditions into causes. In one aspect every death is "caus-ed" by heart failure. But in most cases involving human rights the real question is: What caused the heart to fail? Insurance companies cannot avoid liability under their contracts by confusing, through the speculative theorizing of experts, cause, condition, and effect. The exception under C, supra, does not add to or subtract from the fair meaning of the crucial provision of the contract that the loss (death) must result, "directly and independently of all other causes, from bodily injuries effected solely through * * * accidental means." Kerns v. Ætna Co. (C. C. A.) 291 F. 289, 292. The court's instructions excluded all *causes* except the accident; it could not go further and direct verdicts, without usurping the functions of the jury.

A review of the analogous cases would not be useful. Enough to observe that we find no case which, on fair analysis, supports the defendant's contention. Compare 6 Cooley's Briefs on Ins. (1928 Ed.) pp. 5299, 5305, 5355, and cases cited; Thompson v. Columbian Nat. Life Ins. Co., 114 Me. 1, 95 A. 229.

Defendant's minor exceptions call for but brief comment. The contention that plaintiffs are barred because of the admitted failure to file formal proof of loss is without merit. There was plenary evidence for the jury of waiver; the court's rulings on this point were sufficiently favorable to the defendant.

■ The court was correct in ruling that the policy and the supplement were two contracts running, the one to the estate, the other to the mother.

A highly technical contention of error in excluding the affidavit of a prospectively absent witness, after full opportunity was given to obtain the presence of the witness at the trial, calls for no discussion.

■ The court's allowance as part of plaintiffs' costs of expert fees under R. S. Me. c. 118, § 9, was correct. Compare Primrose v. Fenno (C. C.) 113 F. 375; Michigan Aluminum Foundry Co. v. Aluminum Co. of America (C. C.) 190 F. 903.

The other assignments of error plainly involve no reversible error. Act 1919, 40 Stat. 1181; USCA Title 28, § 391.

The judgments of the District Court are affirmed, with interest and costs.

MORRIS, District Judge, dissents.