AMERICAN GLYCERIN CO. v. EASON OIL CO. et al. *

No. 1617.

Circuit Court of Appeals, Tenth Circuit.

April 29, 1938.

Rehearing Denied Aug. 15, 1938.

*Writ of certiorari denied 59 S.Ct. 107, 83 L.Ed. ——.

480

G. C. Spillers, of Tulsa, Okl. (C. M. Spargo, of Wilmington, Del., and Chas. L. Yancey, of Tulsa, Okl., on the brief), for appellant.

P. C. Simons and E. B. Mitchell, both of Enid, Okl. (L. E. McKnight, R. W. Simons, and L. W. McKnight, all of Enid, Okl., on the brief), for appellees.

Before LEWIS, BRATTON, and WILLIAMS, Circuit Judges.

WILLIAMS, Circuit Judge.

The parties will be referred to in the order in which they appeared in the trial court.

The Eason Oil Company, a corporation, plaintiff, with its coplaintiffs, Marion Oil Corporation, a corporation, and Grisso Royalty Corporation, a corporation, were engaged in the operation of the well in question located in the Oklahoma City oil field. The defendant, American Glycerin Company, a corporation, engaged in the business of shooting oil wells in that and other fields, through its employee and agent, Ernest Taylor, solicited the business of the plaintiffs in shooting said oil well. At that time, J. F. McKaig, an employee of plaintiff, Eason Oil Company, was its farm boss or district superintendent in charge of the well, which had been shot once, McKaig concluding to again have it shot. On prior

occasions, in the shooting of wells for the Eason Oil Company, tin shells had been used by the shooter, considerable debris being left in the well occasioning trouble in bailing the same. Taylor, on soliciting this business from McKaig, was informed that he had had difficulty in cleaning out the holes after the use of tin shells, when Taylor, according to his own evidence, informed McKaig as follows: "I told him I had heard that Mr. Rison had some kind of a composition there that never left anything in the hole."

McKaig, in his evidence, said:

"I met him when he came over to see about shooting wells. We had used tin shells in making prior shots and had trouble bailing this tin out of the hole. Mr. Taylor told me about Risonite or paper shells. He said the dope that he had on these Risonite shells were that when they were exploded, that they would burn up, deteriorate, to where there would be no bridge in the well to bother with bailing out, cleaning out the job.

"I told him I didn't know anything about it, but if that was true, that would be a good shell to use. I had never seen one of these shells before. The first time I saw one was on the day of the explosion. Taylor and I talked about these shells for about two weeks, and in the meantime I had talked to Mr. Lindley, and Mr. Lindley talked to Mr. Eason, and it was agreed that it would be agreeable to go ahead and use the Risonite shells, and Mr. Taylor said they could get them through Mr. Rison of the I. T. I. O. and they would furnish the shells and invoice us for the shells with the shot."

Thereafter, on December 8, 1933, McKaig called Taylor, telling him that they were ready to shoot the well. The next morning the shooters, Capps and Taylor, arrived on the lease with the machines, Taylor having, in the meantime, made arrangements with Rison, the manufacturer of these shells, to furnish defendant with the shells to be used in shooting this well. On the morning of December 9, when this well was to be shot, the employees of the defendant first ran a feeder into the well to test its condition to determine whether the shells would go down when lowered, and measuring the hole to determine just where the shot was to be located.

The truck of the defendant being engaged, Taylor asked McKaig to take his car and go with him to the place of business of Rison, the manufacturer of these shells, at the I. I. I. office, and McKaig accordingly took Taylor in his car.

Taylor stated in his evidence:

"In measuring the well I tied a gage on the torpedo line to see if the well was on bottom. The gage went through the pipe clear to the bottom of the well. We encountered no difficulty in getting down or coming up, ran into no splinters and I concluded everything was clear and got ready to do the shooting. After that I asked McKaig for the first time to go over with me and get the shells, because our wagons were in use. At my request he took his car and went over to the I. T. I. O. place where we talked to Mr. Lowry, representative of Mr. Rison. * * * I had some conversation with Mr. Lowry, or Mr. Rison, about how many shells we should run at once. Mr. Lowry said he recommended running two shells. Lowry was superintendent for the I. T. I. O. under Mr. Rison.

"* * * Mr. Lowry's recommendation to use two shells was followed on the first shot."

Taylor and Capps proceeded to run the first two shells into the well.

In his evidence, Capps said: "We proceeded to lower the shells to the bottom of the hole in the usual and ordinary manner, unhooked from them and reeled in the line."

After the first two shells had been run into the well in the usual and ordinary manner, and in conformity with the recommendations of Rison and Lowry, a man by the name of P. O. Wall, who was an oil field inspector of the Fire Prevention Bureau of the Fire Department of Oklahoma City, insisted that the work of running this nitroglycerin into this well would have to be speeded up, and inquired how many shells they were running at a time, and was told two in conformity with the recommendations of Rison and Lowry, and they discussed the question as to whether they were to abide by the recommendations of the manufacturer of the shells or whether they should run more than two shells at once. Wall said he would go and talk to Rison over the phone about it, which he did, and Rison, again, recommended that they run only two shells at one time. Wall, coming back, reported his conversation to Taylor and Capps, but, on account of the urging of Wall

that more speed must be had, they concluded to run three shells at one time, although in violation of the recommendations of the manufacturer.

They then proceeded to attach three shells to the line, attempting to run them into the well. The line or cable which' was being used by the employees of the defendant to run these shells into the well also was improperly and carelessly spooled upon the reel used for handling the line, by being unevenly spooled, crossing over itself, and piled upon the reel so that when the three shells were run into the hole there was a jumping and jerking of the line with the three shells attached thereto. Each shell was 8 feet in length, making a total length of 24 feet, weight being approximately 133 pounds when loaded with the nitroglycerin. The shells being lowered into the well too fast in view of the fact of a rough line and too many on the line, the result was that at the depth of 2,300 feet from the surface the shells broke loose from the line and dropped to the fluid level in the well, approximately 3,700 feet below the surface. Contact with the fluid caused them to explode, collapsing the pipe, destroying the hole, and filling it full of mud and water. This made it necessary for plaintiffs to do a large amount of work pulling the pipe out of the hole, cleaning out the well, replacing the pipe to again get the well in shape to produce. In doing this work and repairing the damage, plaintiff incurred an expense of $36,163.95. On the trial the only controverted question was as to liability of defendant, as to whether accident was occasioned by its negligence.

On page 15 of appellant's brief, it is said: "There was an attempt to introduce an itemized statement without proof of the reasonable value of the services rendered."

As disclosed by the record, evidence was introduced to the effect that every item included in this statement was the usual and customary charge both for materials and labor, no objection made thereto on ground that it was incompetent, but as to immateriality.

The witness Flore testified that he was the chief bookkeeper in the production department of the Eason Oil Company and that plaintiff's Exhibit A, the original of which was attached to the petition, was a complete list of the costs of reconditioning the well, and that it reflected all the charges made, same being compiled from the original invoices as furnished by the supply companies and contractors, original field pay rolls, field orders from the lease superintendent, the originals of all these papers, including pay rolls, and invoices for all materials purchased, and vouchers for each item as disclosed by the itemized statement were in the courtroom for inspection and objection and exception, etc., it being testified that all of same had been paid.

The witness Hatton, who was the purchasing agent and assistant secretary of the Eason Oil Company, testified that he had examined Exhibit A and the original vouchers from which it was prepared, and that it was true and correct, and that the items therein set out were the customary, usual, necessary and proper charges at the time the expenses were incurred, and that the salaries and wages paid were customary at that time for such work.

Not a question was asked by attorney for defendant of either of these witnesses or of anyone about this itemized statement, or the reasonableness of the charges, and no evidence offered to controvert same.

Plaintiffs' petition alleges various acts of negligence on part of defendant, averring that some, or all of which, combining and concurring, caused the premature explosion and the consequent damage. The bail of the top shell which sustained the weight of itself and the two shells hooked onto it pulled out or broke, caused by the negligent manner in which the defendant ran these shells into the well in violation of manufacturer's instructions with a line jumping and jerking due to the improper spooling of line or cable upon the reel, which together with the extra weight of the added shell caused the same to break loose. It is admitted by the defendant on page 9 of its brief that: "At the lower end of the umbrella bridge there was a wire hook tied together with a soft rope and it was still intact, so it was proof positive that the bail of the upper shell either pulled out or parted."

Capps, a witness for defendant, on cross-examination stated:

"We didn't have any instructions on the first two shells, had no trouble and everything ran perfect. The trouble happened when we had these three shells on.

At 2300 feet they dropped down and broke loose, hit the fluid level which caused them to explode.

\* \* \*

"When Mr. Wall commenced to hurry us an argument arose between Taylor, Lindley and him as to whether you should run more than two shells. It. was not an argument but a discussion as to whether we should or should not abide by the recommendation of the manufacturer of the shells. Wall told me he would go call Rison. He came back and I heard him repeat what he claimed Rison had told him over the 'phone.

\* \* \*

"The line was rough but in ordinary shape."

Defendant's witness Rison, the manufacturer of the shells, testified:

"Q. Now, you also, either that evening or the next morning, directed Mr. Lowry to go to the well where these shells were to be used, and see that they did not run but two at a time, didn't you? A. That is quite correct, sir."

\* \* \*

"In my conversation with Mr. Wall I told him that it had been our policy from the start that notwithstanding our confidence in the strength of our shells, it was still our recommendation for general safety purposes that they should not run but two shells at once. \* \* \* We told him that was our policy in connection with our shooting operations and he could take it or leave it, and that was our recommendation."

It is the contention of the defendant (appellant here) that there was no issue to be submitted to the jury, and that the trial court erred in overruling motion of defendant for directed verdict.

A letter [1] written by the plaintiff, Eason Oil Company, to defendant, American Glycerin Company, immediately following the occurrence of this explosion, and its reply thereto, was admitted in evidence over objection and exception:

"Q. Now, Mr. Eason you sent that notice to the defendant, as I understand, immediately after your acquiring knowledge of the occurrence? A. Yes.

"Q. In the interim between the giving of the notice and the receipt of the answer from the defendant did you take any steps to recondition the well? A. No, we did not.

"Q. Then what was done upon receipt of their letter advising that they disclaimed liability? A. We started to work on the well."

On December 9, 1933, Mr. Lindley, superintendent of the Eason Oil Company, reported to Eason by telephone occurrence of this alleged premature explosion, first information he had of same, and then had a conversation by phone with someone whose name he could not recall in Oklahoma City, purporting to represent the American Glycerin Company, and following that he gave the American Glycerin Company such written notice of the claim of the Eason Oil Company by writing to it the letter [1] in question.

---

[1] Notice to the American Glycerin Company, Inc.:

"You are hereby notified that the well being operated by Eason Oil Company in the Oklahoma City Oil field, known as 'Maxey No. 1', located in Block Sixteen (16), Central Addition to Oklahoma City, Oklahoma, has been greatly damaged by reason of the acts of your company, your agents and employees in causing the same to be shot on December 9, 1933, in a careless manner, as a result of which the well is now standing full of mud, water, and slush and the casing may be entirely shot apart or collapsed and it will be necessary to install standard tools in order to save the hole, if that is possible.

"You are further notified that the Eason Oil Company, for itself and as operating agent for all parties in interest and duly authorized in the premises, looks to you to put said well in the condition· that it was before the same was damaged, as hereinabove set forth.

"You are further notified that it will be necessary that immediate action be taken and this is to give you an opportunity to take charge of said well and to do what may be necessary to restore the same to its former condition and, should you take immediate action, the Eason Oil Company, for itself and other parties in interest, will take such steps as may be necessary in an attempt to save said well and to put it back in the condition it was before the same was damaged and will look to your company to be compensated for all of such expense and damages and will hold your company liable for all such damage and expense.

"You will take due notice hereof and govern yourself, accordingly.

"[Signed] Eason Oil Company
by T. T. Eason
"Its President."

Reply dated December 18, 1933, was received.[2]

■ There was no error. Starr Jobbing House v. May Hosiery Mills, 207 Ala. 620, 93 So. 572; Ede v. Ward et al., 32 S.D. 351, 143 N.W. 269, and Corvallis & E. R. Co. v. United States, 9 Cir., 191 F. 310.

■ As to objection to evidence, on ground that certain nonexpert witnesses were permitted to give opinions, in Chatequgay Ore & Iron Co. v. Blake, 144 U.S. 476, 12 S.Ct. 731, 36 L.Ed. 510, the rule is stated (page 732): "How much knowledge a witness must possess before a party is entitled to his opinion as an expert is a matter which, in the nature of things, must be left largely to the discretion of the trial court, and its ruling thereon will not be disturbed unless clearly erroneous."

See, also, 22 C.J. 518, 521, 526.

These witnesses had had experience and much observation. There is no error in admitting this evidence.

■ Witnesses for both sides agreed that the line was not spooled smoothly, and was rough. In making the statement that he did, McKaig was not expressing an opinion, but stating a fact as he saw it, at the time, to be.

Objection is made to an isolated question and answer thereto as to witness, T. A. Kerns, being present while discussion was going on as to whether three shells should be run at once in violation of the advice and recommendations of the manufacturer of the shell, and when he saw that they were going to run the three shells he then, as stated by him: "I helped Mr. Taylor and Mr. Capps fill the first two shells of the second shot as I had in the first and then found out they were going to run the third shell. I didn't think I had any business there any longer when I found they were going to run the third shell, so I left and went on behind the boiler."

■ No objection was made to this evidence. The action was itself merely explanatory, following the running of the three shells into the well at one time. It was a part of what was taking place, which resulted in the premature explosion, res gestae.

He testified that he had seen approximately 150 or 200 wells shot with glycerin.

Other evidence of which complaint is made in the brief, on the ground that it stated only his conclusion, was as to the discussion set out below to which Lindley had reference in stating that "they were wondering if it would be safe to run three shells at once."

Capps had testified: "When Mr. Wall commenced to hurry us an argument arose between Taylor, Lindley and him as to whether you should run more than two shells. It was not an argument but a discussion as to whether we should or should not abide by the recommendations of the manufacturer of the shells. Wall told me he would go call Rison, * * *."

[6, 7] The evidence was not subject to the objection made, but if it were it would not result in a prejudicial error. See McKelvey on Evidence, §§ 139 and 140; Wharton's Criminal Evidence, § 261a; Hawkins v. U. S., 5th Cir., 293 F. 586; and U. S. v. DeVasto, 2d Cir., 52 F.2d 26, 29, par. 8, 78 A.L.R. 36.

Lindley also testified that he was not an oil well shooter by trade or profession, never having shot a well in his life, but had seen many wells shot, and was an experienced oil well driller, and had observed and assisted in the shooting of oil wells for approximately 20 years.

· Defendant's (appellant) counsel complain that Lindley testified 'that all of the mechanics engaged in lowering those shells into the well were under (its) employment. This was disclosed by the evidence. Defendant furnished the equipment and the

[2] Letterhead of American Glycerin Company, Legal Department, 7058 Du Pont Building, Wilmington, Delaware December 18, 1933
"Eason Oil Company,
"Enid Oklahoma
"Attention Mr. T. T. Eason, President
"Gentlemen:
"Receipt is acknowledged of your notice addressed to this Company at Tulsa, Oklahoma, with reference to your oil well known as Maxey No. 1, located in Block 16 Central Addition to Oklahoma City, Oklahoma, which has been referred to this office for attention.
"Please be advised that our investigation indicates that the damage to this well was not occasioned by actionable negligence on the part of our agents and/or employees. For that reason we deny liability in the premises.
"Very truly yours,
Abel Klaw
"[Signed] Abel Klaw
of Counsel."

shells that were lowered into the well and the men who did the work. Another expression of Lindley complained of was not an expressed opinion but a statement of fact. He testified: "It wasn't spooled evenly. The line running back and forth across the reel there would be humps in it. It would be piled up here and then there would be a low place, and the line crossing that would naturally jerk, and on any line if it was not spooled evenly the line would be jumping."

Reference is made to Bean v. Independent Torpedo Company, 8th Cir., 4 F.2d 504, in which there was no testimony offered as to the cause of the explosion, but merely opinions of the witnesses, which were merely a guess as to what might have caused the explosion, rather than testimony, as is presented in this case, to show what did cause the explosion.

The court among others instructed the jury:

"You are further instructed that in reaching a verdict you are not permitted to indulge in speculation, or to guess at results. You must base your verdict upon the facts, upon the testimony of the witnesses who have testified from the stand, and before you can find for the plaintiffs you must find from the evidence introduced in this case that the defendant's agents were guilty of negligence, and that such negligence was the proximate cause of the explosion which resulted in the damages which plaintiffs have sustained. * * *

"If you find for the plaintiffs you will fix their damages at such sum as will reasonably compensate them for the damages they have sustained, under the evidence, not, however, in excess of the sum of $36,163.95, the amount sued for."

After the jury had retired and had considered the case, they returned into court for further instruction and the court further charged the jury as follows:

"With respect to the amount of damages in this case there was no evidence introduced as to the amount the plaintiffs allege they were damaged except the evidence of the plaintiffs. Their evidence was to the effect that the cost of reconditioning this well was $36,163.95. The court instructed you that if you found for the plaintiffs you should fix their damages at such sum as would reasonably compensate them for the damages they have sustained under the evidence; not, however,

in excess of the sum of $36,163.95, the amount sued for. Now if you find from the evidence that was introduced by the plaintiffs that the cost of reconditioning the well was $36,163.95, then you are instructed that you should return a verdict for that sum. Are there any other questions? An exception is allowed—

"Mr. Spillers: To the action of the court in giving this additional instruction the defendant excepts, and calls especial attention to the fact that this instruction does not state or fix the correct measure of damages in this case, and that it is not supported by the evidence introduced by the plaintiff, and it is an incorrect statement of the law on the measure of damage applicable to this case."

In plaintiff's petition, it is alleged:

" * * * that as a result of the explosion of said nitro-glycerin shells in the well belonging to these plaintiffs and at the point and in the manner hereinabove set forth, the casing was shot apart and completely collapsed and the plaintiffs, in an effort to place said well back upon production and to prevent a total loss thereof, installed special tools and equipment to drill by or through the point where the casing was collapsed, which work was diligently pursued by the plaintiffs and completed August 21, 1934, on which date said well was placed back on production, and in so doing the plaintiffs necessarily incurred an expense of thirty-six thousand one hundred sixty-three and 95/100 ($36,163.95) dollars, and that such expense is fully reflected and completely itemized in Exhibit 'A' attached hereto and made a part hereof.

"Plaintiffs further allege and state that such expenses and the damages so suffered by these plaintiffs was and is the direct and proximate result of the careless and negligent acts done and performed by the defendant through its agents and employees in the shooting of said well as hereinabove set forth and by reason whereof the defendant became and is justly indebted to these plaintiffs in the sum of thirty-six thousand one hundred sixty-three and 95/100 ($36,-163.95) dollars, together with interest at 6% per annum from August 21, 1934, until paid, and the defendant has failed, refused, and neglected to pay or reimburse the plaintiffs for such expense or any part thereof."

Judgment was rendered on the verdict in favor of plaintiff in the sum of $36,163.95, from which this appeal followed.

The evidence proved that this itemized statement reflected all of the charges that were made for work and materials used in reconditioning this well, it being made up from the original invoices and pay rolls, all of which were in court at the time such evidence was given, and available for examination or inquiry in regard thereto by counsel for defendant, it being then and there so stated that they were so available. The evidence also shows that said items as set out in Exhibit A, introduced in evidence, were true and correct, and that the material, salaries, and wages therein were shown to be the customary prices paid for work of that kind and character and material.

Not a question was asked any of the witnesses testifying relative thereto by counsel for appellant (defendant) on cross-examination. No item of the expenses incurred was questioned by the defendant at any time during the trial. Objection was made by defendant to the introduction of this itemized statement on the ground that it was irrelevant, without a suggestion that it was incompetent.

It was material to prove the amount of expense reasonably incurred and paid by the plaintiffs in repairing the damage resulting to the well occasioned by the proved negligence of the defendant. No testimony was offered by the defendant to controvert, dispute, or in any wise question any item paid by plaintiffs in repairing the damage, the only contention raised by evidence being as to whether the plaintiffs had proved negligence and were entitled to recover at all.

Appellant (defendant) has neither assigned as error nor excepted to, the original instruction as to question of damages, but has as to this additional instruction.

A further exception is to the instruction: "You are instructed that nitro-glycerin is a highly explosive substance; that it is very sensitive, and that in handling said substance the defendant was bound to exercise the highest degree of care," the complaint being that it placed upon the defendant a greater degree of responsibility than the law requires.

In Eargle v. Sumter Lighting Co., 110 S.C. 560, 96 S.E. 909, 911, it is said:

"In this connection, it may not be amiss to call attention to an error into which appellant's attorneys have fallen with respect to certain language found in some of our opinions with regard to the degree of care to be exercised in handling electricity. They [appellant's attorneys] say:

"'The law, as established by the decisions of this court, is that it requires a very high degree of care, *and not simply ordinary care.*' (Italics ours.)

"This court has not held that the degree of care required is more than ordinary care. What we have held is that, in dealing with an agency known to be so dangerous and deadly, a very high degree of care is required; but that is nothing more than a different way of expressing what is axiomatic in the law; that the degree of care to be exercised in every case should be commensurate with the danger—the greater the danger, the greater the care required—that a very high degree of danger calls for a very high degree of care; and if the quotations cited by appellant from the opinions of this court in Parsons v. Electric Co., 69 S.C. 305, 48 S.E. 284, 104 Am.St.Rep. 800, and Lundy v. Telephone Co., 90 S.C. 25, 72 S.E. 558, be attentively considered, it will be seen that they do not warrant the construction put upon them by appellant."

In Morrison v. Appalachian Power Company, 75 W.Va. 608, 84 S.E. 506, 508, it is said: "Having the ownership and control of such a dangerous agency as electric transmission wires, defendant was bound to exercise a degree of care commensurate with the danger likely to be produced by its negligence. It was bound to a high degree of care to see that the current was not permitted to escape from the wire in such way, and by such means, as to injure persons in lawful use of the public highway. Thomas v. Electrical Co., 54 W.Va. 395, 46 S.E. 217; Thornburg v. City & Elm Grove R. R. Co., 65 W.Va. 379, 64 S.E. 358. 'Reasonable care' and 'negligence' are relative terms and depend upon the circumstances and exigencies of the particular case. The greater the danger to others from failure to exercise care, the greater is the degree of care required. Van Winkle v. American Steam-Boiler Co., 52 N.J.L. 240, 19 A. 472; Armbright v. Zion, 108 Iowa 338, 79 N.W. 72; Schutte et al. v. United Electric Co., 68 N.J.L. 435, 53 A. 204."

See, also, 45 C.J., p. 696.

The court proceeded:

"You are further instructed that if you find that the premature explosion in this case resulted from the carelessness and negligence of the defendant or its agents as

alleged by plaintiffs, then in that event, it is your duty to find for the plaintiffs.

"Negligence is the doing of that which an ordinarily prudent person would not do under the same or similar circumstances, or the failure to do that which an ordinarily prudent person would have done under similar circumstances."

All the instructions being considered as an entirety, there is no reversible error.

In S. S. Kresge Co. v. McCallion, 8th Cir., 58 F.2d 931, at page 934, it is said: "It is not difficult to destroy almost any charge by isolating certain limited expressions therein, but the charge must be considered as a whole with the view of determining the impression conveyed thereby to the jury."

As to negligence and amount of damages, that was a question for the jury under proper instructions. Neither error in said instructions, nor evidence admitted, appears in the record to which the appellant has any just ground for complaint.

The judgment is affirmed.

### On Rehearing.

BRATTON, Circuit Judge.

Appellant contends in its petition for rehearing that it was deprived of its constitutional right to have its cause fairly presented in this court. The contention is predicated upon the declination of the court to permit counsel to exhibit certain physical equipment and to use it in connection with his oral argument. It is stated in the affidavit of counsel, made a part of the petition, that one of the shells which was purchased for use in lowering the charge of nitroglycerin in the well was placed in the court room prior to the submission of the cause; that a portion of the torpedo line, umbrella bridge, hook, and piece of soft rope were suspended on a frame in the corridor immediately adjacent the court room; that the shooting car with the torpedo line and equipment thereon was placed at the front door of the court house; that at the commencement of the argument and once later counsel asked permission to bring into the court room the portion of the torpedo line, the umbrella bridge, the hook, and the piece of soft rope, and to suspend them on a framework and explain them to the court in the argument; that the further request was for the court to view the shooting car, the reel, and the equipment at the front door of the building; and that the request was denied. It was not understood by the court that the identical equipment had been introduced in evidence on the trial below. Neither was it understood that any of it was in the court room at the time the request was made. Instead, it was understood that the equipment was identical in kind with that used in connection with the shooting of the well; that some of it was in the corridor adjacent the court room; that the remainder was at the street curb in front of the building; and that counsel desired to make proference in aid or by way of explanation of his argument. But that is not material. At the time the request was first made counsel was advised to proceed with his argument and that the court would determine as the argument went forward whether exhibition of the equipment was needed or would be helpful. It was the opinion of the court at the time the request was renewed that the exhibition was neither necessary nor conducive to a thorough understanding of the case, and for that reason the request was denied.

The question whether heavy, bulky, or unwieldy articles, or other demonstrative evidence shall be brought into the court room and exhibited to the court and jury, or whether the court and jury will view articles or demonstrative evidence outside the court room rests in the sound judicial discretion of the trial court. Hood v. Bloch, 29 W.Va. 244, 11 S.E. 910; Souther v. Hunt, Tex.Civ.App., 141 S.W. 359; Harrild v. Spokane School Dist., 112 Wash. 266, 192 P. 1, 19 A.L.R. 811; Thompson v. Columbian Nat. Life Ins. Co., 114 Me. 1, 95 A. 229; 2 Wigmore on Evidence § 1161; 3 Jones on Evidence § 398. Manifestly that doctrine has appropriate application in the submission of a cause in an appellate court. It was wholly unnecessary to exhibit the equipment in question. With his usual ingenuity, counsel presented the contentions of appellant in such an erudite manner that they could not be misapprehended. They were so well understood that proference of the equipment would not have aided the court in determining the questions. But after the argument had been concluded, that part of the equipment which had been in the court room and in the corridor was placed in the office of the clerk, and in the interest of thoroughness members of the court there examined it with care. No right of appellant was disregarded or violated.

One further contention merits a word. It is that appellant did not manufacture the shells which were used in preparation for shooting the well; that the accident was due to some latent defect in one of them, or in the bail, or in the manner of the insertion of the bail in the shell; that there was no evidence to show what caused the bail to pull out or become detached from the shell; that it may have been due to many causes for which appellant was in no wise to blame; that the testimony leaves the matter uncertain; and that for such reason there is no liability. The cases of Patton v. Texas & Pacific Ry. Co., 179 U.S. 658, 21 S.Ct. 275, 45 L.Ed. 361; Lynch v. International Harvester Co., 10 Cir., 60 F. 2d 223; U. S. Radiator Corporation v. Henderson, 10 Cir., 68 F.2d 87, and Smith v. S. S. Kresge Co., Inc., 8 Cir., 79 F.2d 361, are relied upon to sustain the argument. The contention would have tenable basis if the evidence pointed clearly and convincingly to the fact that the accident was due to a latent defect in the shells which appellant furnished, but did not manufacture, or that the cause of the accident was purely speculative or conjectural. But that is not the situation. There was substantial evidence tending to show (1) that three shells were lowered into the well at a time in disregard of the advice of the manufacturer that only two be lowered together, (2) that the three shells were lowered too fast, and (3) that the line was not spooled evenly on the reel, that it had humps in it, that it was piled up in places and had low places, and that such conditions caused a jumping and jerking action as the shells were lowered. The evidence is attacked on various grounds, but it was enough to present the issue of negligence on the part of appellant as the direct and proximate cause of the explosion. The court submitted the issue of negligence in clear and direct language. The jury were told that before a verdict could be returned for appellees they must find that appellant was guilty of negligence in connection with the lowering of the shells in the well and that such negligence was the proximate cause of the accident; and further, that they could not indulge in guesswork or speculation. The evidence was sufficient to warrant a finding with reasonable certitude that one or more of the acts of negligence of the appellant caused the accident, not a latent defect in the shells. The issue of negligence was resolved against appellant; there is substantial evidence to support the finding; and under the often repeated rule, it will not be disturbed on appeal.

Other contentions previously advanced and argued at length are renewed. They have received painstaking consideration, and we think they lack merit. The petition is denied.