## Beley *v.* Pennsylvania Mutual Life Insurance Co., Appellant.

232

Argued November 12, 1952. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

reargument refused March 24, 1953.

Same case in Superior Court: 171 Pa. Super. Ct. 253.

*Thomas Lewis Jones,* with him *W. Denning Stewart* and *Stewart & Jones,* for appellant.

*Samuel J. Goldstein,* with him *Herbert Jacobson,* for appellee.

OPINION BY MR. CHIEF JUSTICE HORACE STERN, February 14, 1953:

Is the present struggle in Korea a "war" within the meaning of that term as employed in a certain life insurance policy? That is the question for decision in this litigation. In the action brought to recover on such a policy the County Court of Allegheny County awarded to plaintiff, under the terms of the policy, only a return of the amount of the premiums which had been paid thereon. On appeal, the Superior Court reversed and entered judgment for plaintiff for both the face amount of the policy and the additional accidental death benefit. From that decision (171 Pa. Superior Ct. 253, 90 A. 2d 597) we allowed an appeal, the determination of the issue involved being obviously of concern to many beneficiaries of identical or similar policies.

Andrew Beley, serving with a United States Army infantry division in the conflict in Korea, was killed in action on March 7, 1951 while serving with the United States contingent of the United Nations forces. On May 1, 1945, Pennsylvania Mutual Life Insurance Company, defendant, had issued a policy on his life in favor of his mother, Julia Beley, the present plaintiff. The policy was in the amount of $1,000 with a supplementary contract attached which provided for double indemnity in case of external, violent and accidental death. One of the provisions of the policy was that "In the event that the Insured engages in military or naval service in the time of war, the liability of the Company shall be limited to the return of the premiums paid hereunder, unless the Insured shall have previously secured from the Company a permit to engage in such service." (Admittedly, no such permit had been secured.)

In connection with the additional accidental death benefit there were provisions as follows: "Risks Not

Assumed:—The Company shall not be liable for the additional Accidental Death Benefit specified above if said death shall result by reason of any of the following: . . . (d) Military, air or naval service in time of war. (e) Any work in connection with actual warfare, riot, insurrection, police duties or any act incidental thereto, either on land or water. . . ."

"Termination:—These provisions for the additional Accidental Death Benefit shall immediately terminate: . . . (b) if the Insured shall at any time, voluntarily or involuntarily, engage in military, air or naval service in time of war; . . . ."

The Company refused payment of the face amount of the policy on the ground that the insured was engaged in military service "in the time of war" and refused payment of the accidental death benefit on the additional ground that the death of the insured had resulted by reason of such service. In our opinion, the Superior Court properly entered judgment for plaintiff for the whole amount of her claim.

The facts concerning the Korean situation are, briefly, as follows:—By the charter of the United Nations there was established the principle of mutual assistance, and certain provisions were embodied therein for insuring effective and prompt action for the maintenance of international peace. In pursuance of that object Congress, in the Mutual Defense Assistance Act of October 6, 1949, 63 Stat. 716, authorized the President to furnish military assistance, as therein provided, to the Republic of Korea and the Republic of the Philippines. On June 25, 1950, a commission having reported that North Korean forces had made an unprovoked assault upon the Republic of Korea, the Security Council denounced the attack as a breach of international peace, called upon the authorities of North Korea to withdraw their armed forces forthwith, and asked all members of the United Nations to render every as-

sistance in the execution of the resolution. On June 27, 1950, the President made a public statement in which he referred to this call by the Security Council and stated that under such circumstances he had ordered United States air and sea forces to give the Korean government troops cover and support. On that same day the Security Council by a second resolution recommended that the members of the United Nations furnish whatever assistance to the Republic of Korea might be necessary in order to repel the armed attack and to restore international peace and security in the area. On July 7, 1950, still another resolution of the Security Council recommended that all members provide military forces and other assistance for a unified command under the United States, requested the United States to designate the commander of such forces, and authorized the use of the United Nations' flag in the action against the North Korean invaders.

Although Congress has, in certain enactments, recognized that military forces of the United States are operating in Korea and has appropriated funds for the support of the armed forces there, it is obvious from the above recital of events that there was not, nor ever has been, any declaration of war by Congress against any other country, state or nation, but merely a dispatch to Korea by Presidential order of military, naval and air forces of the United States in accordance with the provisions of the Charter of the United Nations and the recommendations of the Security Council. Since, therefore, it is Congress that has the power under the Constitution to declare war, and since that power is exclusive (*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U. S. 579, 642), it is clear that the action being waged in Korea is not a "war" within what may be termed the "constitutional" or "legal" sense of that term. Defendant urges, however, that it is in *fact* a war, because what started apparently as a minor "police

action" has developed, by reason of its duration, its bitterness, and the number of its casualties, into a sanguinary struggle of grave proportions, and urges further that the connotation of the word "war" in the Company's insurance policies should not be limited to a formally declared war, but embraces any clash of arms in which the methods of war are pursued, and especially where the conflict is, as in Korea, of such extensive dimensions. The trouble with this argument is that if the word "war" in such policies were to be interpreted as other than one declared by Congress, courts would be utterly at sea whenever the question arose as to whether certain expeditions in which United States forces were engaged constituted a war. It has been pointed out in a report of the Committee on Foreign Affairs of the House of Representatives that during the period between 1798 and 1945 there were some 150 or more occasions on which our military forces were engaged in various countries, notably in China, Mexico, Central America and Caribbean Republics, in the course of some of which incidents there were really serious engagements and many casualties. Who, then, would be the tribunal to decide whether such an undeclared conflict did or did not amount to a "war," —a jury, a court? What would be the criterion of decision,—the number of troops involved, the number of casualties, the duration of the hostilities? If, for example, Beley had lost his life in action in Korea a day or two after our troops first arrived there, would a war have then existed, or would it not have become a war until the magnitude of the struggle finally revealed itself and the casualty lists became so distressingly long and frequent?

Obviously the right of an insured to recover under a life insurance policy should not be left to depend upon the determination of a question not governable by

any definite test either legal or factual; on the contrary, its terms and conditions should be interpreted according to some definite and uniform standard. Even were it to be conceded that the meaning of any of its terms was really involved in doubt, that doubt, according to all established canons of construction, should be resolved in favor of the insured. A policy of life insurance is a highly technical instrument, drawn up presumably with meticulous care by legal experts on behalf of the Insurance Company, and who not only intend to use all terms in their legal sense but know how to accomplish that result; it may be assumed, therefore, that if defendant had here meant to invest the term "war" with a broader connotation than its "constitutional" or "legal" intendment, it would have effected this by the addition of words indicating such an intention as, for example, "declared or undeclared" war.

The existence or non-existence of a state of war is a political, not a judicial, question, and it is only if and when a formal declaration of war has been made by the political department of the government that judicial cognizance may be taken thereof; when so made it becomes binding upon the judiciary: *Bishop v. Jones & Petty,* 28 Texas 294, 319, 320; *Perkins v. Rogers,* 35 Indiana 124, 167; *Hamilton v. M'Claughry,* 136 Fed. 445, 449; *Verano v. DeAngelis Coal Co.,* 41 F. Supp. 954. An exact question involving the application of this principle arose in connection with the Japanese surprise attack on Pearl Harbor on December 7, 1941, war with Japan not being officially declared by Congress until the day following, December 8. As we all know, an appalling number of lives were lost in that infamous attack, and yet, in a majority of the cases involving the interpretation of the word "war" as employed in life insurance policies similar to the one here in question, it was held that war did not exist on De-

cember 7, and therefore the beneficiaries of such policies were entitled to recover: *West v. Palmetto State Life Insurance Co.*, 202 S. C. 422 (25 S.E. 2d 475); *Rosenau v. Idaho Mutual Benefit Association*, 65 Idaho 408, 145 P. 2d 227; *Savage v. Sun Life Assur. Co. of Canada*, 57 F. Supp. 620; *Pang v. Sun Life Assur. Co. of Canada*, 14 C.C.H. Life Cases 496 (37 Hawaiian Rep. 208).

The provision in the present policy exempting defendant from liability for the additional accidental death benefit if death should result by reason of "any work in connection with actual warfare, riot, insurrection, police duties or any act incidental thereto, either on land or water," evidently refers to civil work as distinguished from the immediately preceding exemption in the case of "military, air or naval service," and therefore has no application to the present case. It may be noted, however, in passing, that in this particular clause the term "actual warfare" is used, indicating an appreciation on the part of the insurer of the distinction between the more technical term "war," and the general term "actual warfare."

Defendant directs some argument to the proposition that, even if it be held that the insured was not engaged in military service in time of war as far as the action in Korea is concerned, the United States was still at war with the Axis Powers when Beley was killed on March 7, 1951. Although the Constitution provides that Congress is the authority to *declare* war, there is no provision in regard to an authority which should have the power to declare the *termination* of war. It is true that for certain special purposes it may be important or even necessary for Congress or the President to declare officially a date marking a time when a war is to be considered as legally ended; indeed different such dates may be designated for various pur-

poses. For the particular purpose here involved there was no need for a pronouncement that the war with Germany, Italy and Japan had in fact terminated some six years before Beley's death, although it may be added, as pointed out by the Superior Court in *Harding v. Pennsylvania Mutual Life Insurance Company*, 171 Pa. Superior Ct. 236, 241, that a joint resolution of Congress of July 25, 1947 (61 Stat. 449) did declare that, in order to terminate certain emergency and war powers, the war with those countries should be deemed ended as of that date.

The judgment of the Superior Court is affirmed.

———

CONCURRING OPINION BY MR. JUSTICE MUSMANNO:

On March 4, 1945, Julia Beley made application for a policy of life insurance in the sum of $1,000 on her son Andrew Beley, then a student 17 years of age. The policy, which was issued May 1, 1945, provided, *inter alia*: "In the event that the Insured engages in military or naval service in the time of war, the liability of the Company shall be limited to the return of the premiums paid hereunder, unless the Insured shall have previously secured from the Company a permit to engage in such service."

The policy allowed for additional benefits of $1,000 in the event the insured came to his death by accidental means, but under the heading: "Risks not assumed:" the contract read: "The Company shall not be liable for the additional Accidental Death Benefit specified above if said death shall result by reason of any of the following: (a) . . . (b) . . . (c) . . . (d) Military, air or naval service in time of war. (e) Any work in connection with actual warfare, riot, insurrection, police duties or any act incidental thereto, either on land or water. . . ."

On October 28, 1950, Andrew Beley, who had had some previous military experience, was recalled into active service and in due time sailed to embattled Korea where on March 7, 1951, he made the supreme sacrifice.

His mother submitted proofs of death to the insurance company which refused payment under the policy on the ground that her son's death came within the excepted provisions of the policy.

Mrs. Beley brought suit in assumpsit for $2,000. The company offered to return the premiums paid, which amounted to $152.60, and the Allegheny County Court entered judgment in favor of the plaintiff in that amount. The plaintiff appealed to the Superior Court where the judgment of the Allegheny County Court was reversed and entered in favor of the plaintiff in the full amount of the policy.

The insurance company has appealed to this Court, submitting for our consideration the following questions:

Did Andrew Beley come to his death while in military or naval service in time of war?

Was he at the time of his death engaged in military, air or naval service in time of war?

Was he engaged in any work in connection with actual warfare, riot, insurrection, police duties or any act incidental thereto, either on land or water?

In discussing the principles of law involved in this case, we must assert at once that to deny that the Korean military action is war in its popularly accepted meaning is to deny the evidence of one's senses. Courts normally take judicial notice of whatever is unquestioningly accepted by informed society as fact. A judge does not ask in court for proof that ice forms at the North Pole or that the World Series refers to a contest between baseball teams. Courts know that in Korea, armies are pitted against each other utilizing

every device known to modern warfare in the effort and determination to exterminate each other. We know this to be true because every medium of communication extant informs us that it is true. There is not one voice, one printed word, or one picture in the newspapers, radio broadcasts and television images which present themselves before our eyes or appeal to our ears that bespeaks anything to the contrary. In addition, judges have physically seen soldiers who have returned from Korea and have witnessed the evidence of their contact with forces which have inflicted wounds peculiarly the result of gunfire and cannon fire, the trademark of war.

Judges have seen, through the media of incontestible authenticity, photographic evidence of flag-draped caskets being returned by ship from the distant peninsula of Korea. Figures released by the United States Government, through official reports which the courts accept unless controverted (and there has been no denial anywhere of their accuracy), establish that our casualties in Korea have reached the dreadful total of more than 128,000, of which 22,519 represent deaths. Nothing can more graphically identify conflict as war than grave casualties of this awesome character.

And yet, the Spanish American war, which is accepted governmentally and historically and in every other manner as a full-scaled war, produced the *relatively* small number of 361 battle deaths and 2,565 deaths by disease. The total casualties reached, again *comparatively*, the small number of 4,506. The number of American troops engaged was 306,760.

However, even the loss of one life or none at all, if there be a solemn declaration of war, makes any military action, war. Congress is the only body in the United States which can declare war. The Korea conflict is a non-congressionally declared war. Does that

in itself make it legally different from a congressionally declared war? The answer to that question is the answer to the question posed in this lawsuit.

As early as 1800, the Supreme Court of the United States, in the case of *Bas v. Tingy*, 4 Dallas 35, 38, drew a distinction between a declared or solemn war and an undeclared or imperfect war: "If it be declared in form, it is called solemn, and is of the perfect kind; because one whole nation is at war with another whole nation; and all the members of the nation declaring war, are authorized to commit hostilities against all the members of the other, in every place, and under every circumstance. In such a war all the members act under a general authority, and all the rights and consequences of war attach to their condition.

"But hostilities may subsist between two nation, more confined in its nature and extent; being limited as to places, persons, and things; and this is more properly termed imperfect war; because not solemn, and because those who are authorized to commit hostilities, act under special authority, and can go no farther than to the extent of their commission."

In 1866 the Supreme Court of Texas, discussing the Civil War, said in *Bishop v. Jones & Petty*, 28 Tex. 294, 319: "War in its legal sense has been aptly defined to be 'the state of nations among whom there is an interruption of all pacific relations, and a general contestation of arms authorized by the sovereign.' It is true, it may and has frequently in latter times been commenced and carried on without either a notice or declaration. But still, there can be no war by its government, of which the court can take judicial knowledge, until there has been some act or declaration creating or recognizing its existence by that department of the government clothed with the war-making power."

War, as defined by Corpus Juris, must ". . . be an

armed struggle carried on between two political bodies each of which exercises *de facto* authority over persons within a determinate territory, and its existence is determined by the authorized political department of the government. *So, lawful war can never exist without the actual concurrence of the war-making power, but may exist prior to any contest of the armed forces. The courts are bound by a declaration or determination by the proper department of government that a war exists, while until there has been been such a declaration or determination the courts* cannot take judicial notice of the existence of a war by their government." (67 C.J. 336). (Emphasis supplied)

This authority says further: "A court cannot, however, take judicial notice of a war by its government until there has been some act or declaration creating or recognizing the existence of war by the department of the government clothed with the war-making power." (67 C.J. 338).

On February 20, 1951, the Committee on Foreign Affairs of the United States House of Representatives released a report (House Report No. 127) which officially refers to the operation in Korea not as war but as Action in Korea. Specifically it states: "No declaration of war has been made by the Congress. The President has not proclaimed a state of war, nor have the North Korean or Chinese Communists authorities."

If the drafters of the contract of insurance which was sold to the plaintiff here intended the word War used therein to be interpreted in its constitutional sense, the plaintiff is entitled to recover, since the action which brought about the death of Andrew Beley was not within the purport of the exclusionary clause. The task of the judiciary in this case has been not to define the word War in its broad general application but what it was intended to mean by the parties to

the contract, in the light of the history and the circumstances of the time.

The word War has many meanings. In addition to being an armed conflict, it may be defined as an act of opposition, as an inimical contest, as hostility and strife. It may have a locale not ordinarily associated with its gunpowder connotation, as, for instance, Milton speaks of "impious *war* in heaven," and in Psalms (lv. 21) we find: "The words of his mouth were smoother than butter but *war* was in his heart." The word War may take on still further meanings when conjoined to another word which has acquired a particular significance because of the history of the times. Thus, the phrase Cold War has painted a canvas of dramatic and tragic scope and depth beyond the capacity of imagination a decade ago.

The question presented by this case has not definitively been passed upon, so far as research can ascertain, by any court of last resort in the United States. However, various decisions have lifted lanterns of light on the seeming paradoxical query as to whether the conflict in Korea is War or not. The decision in the case of *New York Life Ins. Co. v. Durham,* 166 F. 2d 874, sheds its own particular beam of analysis on the subject. There, the New York Life Insurance Company, on December 1, 1943, issued a policy of insurance on the life of Lewis Durham conditioned that the amount payable should be restricted if the death of insured should occur " 'outside the home areas while the insured is in the military or naval forces of any country engaged in war . . . "war" includes undeclared war.' " On September 25, 1945, while the policy was in full force and effect, and the insured was in the military forces of the United States, he died outside the home areas from wholly non-military causes. The Insurance Company denied liability for the face amount

of the policy, contending that the death of the insured came within the excluding provisions of the policy. The lower court entered a judgment in favor of the plaintiff in the full face value of the policy and the Circuit Court of Appeals, Tenth Circuit, on March 4, 1948, affirmed the judgment, on the basis that as the death of the insured occurred after the surrender of the enemy, even though no treaty of peace had been signed, the insured "was not in the service of a 'country engaged in war', as those words were used to measure coverage in the insurance contract."

The Court did say in that case that "The existence of war and restoration of peace are determined solely by the political departments of our Government, and such determinations are conclusively binding upon the Courts in all matters of state or public concern, and war having been declared, its existence must be recognized by the Courts until peace is proclaimed, although actual warfare may have ceased." Nonetheless, the Court went on to say that: . . . "in all private matters, unaffected by public interest, *the parties are undoubtedly free to contract with reference to war and to give it such definition, connotation and meaning, as does not infringe upon public policy."* (Emphasis supplied.)

When this case came before the Allegheny County Court, the learned Judge LORAN LEWIS of that Court filed a dissenting opinion in which he appropriately said: "If the word 'war' was to include every type of hostility that might occur between the armed forces of different nations without an open declaration of war, then the insured could not possibly know whether his beneficiary would be protected if he met his death while hostilities were going on. The company could not possibly know what their liability would be under the contract until some court decided if the hostilities referred to constituted a 'war'."

"I do not believe the insured or the company intended to enter into any such guessing contest as to what their legal rights were under the policy."

I agree with Judge LEWIS that the adjudication of the rights of the contending parties cannot be ascertained through the process of conjecture or chance. The insurance company, whose attorneys wrote the contract, must stand by the words employed by their agents; and in this connection War, in the contemplation of the law of the United States, can only mean war declared by the only authority that can declare it, i.e., Congress.

If we were to denominate as war all foreign actions in which United States military forces have been engaged, we would have to conclude that the United States has practically never been at peace in the history of our country. From 1798 to 1952 the United States has used armed forces abroad some 150 times.[1] Some of these actions, of course, involved no casualties but many of them did. But it is not the number of casualties which decides whether or not a foreign military action is a "legal" war or not. No one would have seriously contended that the slight commitments of American troops on June 27, 1950, to the Korean action, constituted war. Nor would authorities on international law have declared that the American action in Korea a month later constituted war. If the Korean action was not war on June 27 or July 27, when did it become war? Five months later? A year later? When?

Would the appellant insurance company argue that the military action became war when the casualties reached a certain figure, say, 5,000 or 10,000? Would it argue that the action certainly was war when the

---

[1] House Report No. 127, pp. 55-62.

casualties mounted to 50,000? And if we assume that a certain degree on the metamorphical thermometer of casualties marked the point at which the military action became war, who would determine when that point was reached? The courts certainly could not declare that point of demarcation, and there is no law which provides for such an arbitrary determination of what constitutes war. Nor could it be argued successfully that a military action becomes war when a certain period of time has elapsed, since there is no constitutional or statutory basis for such an automatic chronological determination. The courts interpret law and construe facts; they cannot *make* facts, and that is what, in effect, the appellant would have us do by asking that we decide when the military action in Korea passed from a military action into a legal or constitutional war.

If the logic of the appellant insurance company were to be accepted in application to history, then the Pershing Punitive Expedition into Mexico, the Boxer Expedition into China, the many Nicaraguan Marine expeditions and others of that character, all involving American casualties, would have to be regarded as wars. But no historian would agree with such a conclusion.

There can be acts of war without there being a state of war. Beley was killed by an act of war but not in a state of war. The case of *New York Life Ins. Co. v. Bennion,* 158 F. 2d 260, is illustrative of this proposition. Captain Bennion, commanding the battleship West Virginia, was killed at Pearl Harbor on December 7, 1941, at the time of the Japanese sneak attack. War against Japan was not declared until the following day. The insurance policy on Captain Bennion's life did not cover "undeclared war" and the court of first instance allowed recovery on the policy. The Circuit Court of Appeals, however, reversed the judgment because the policy excluded coverage for death

resulting from "war *or any act incident thereto*". (Emphasis supplied). The attack of December 7th was certainly an act incident to war even though the state of war had not come into being.

Commenting on this decision later on, in the case of *New York Life Insurance Co. v. Durham*, supra, the Circuit Court added this illuminating observation: ". . . while recognizing that the existence of a state of war was a political question to be determined solely by the political departments, we were nonetheless of the opinion that the political determination of the commencement of war was immaterial if the parties to the private contract, clearly intended that war should have a different meaning. When the contract was viewed in its context and the manifest intent of the parties ascertained, we were of the opinion that they contracted with reference to war in its real and practical sense; that is, its hazards to human life, and that the Courts were not required to 'affect a technical ignorance' of actualities." For that reason, as already indicated, the Court held that the attack on Pearl Harbor, before the formal declaration of war was "war or an act incident thereto" within the meaning of the insurance contract, which used those exclusionary words.

In the case of *Harding v. Pennsylvania Mutual Life Ins. Co.*, 171 Pa. Superior Ct. 236, which is recognized as a companion case to the one at bar, the Superior Court held against the insurance company's contention, practically identical with the one advanced here. The learned Judge DITHRICH of the Pennsylvania Superior Court, in a very interesting and able opinion, said: "Since 'war' is a word which has been held to import various meanings, it is incumbent upon the insurer to make clear that it applies to undeclared war, as well as to declared war, for even if the action in Korea

should be held to be war, it is at most an undeclared war. In our opinion the insurer has failed to meet the burden cast upon it. The attempt of the appellee to evade liability of double indemnity should not receive judicial condonation. The phraseology of the policy was chosen by the insurer and tendered in fixed form to the prospective policyholder, and since its language is reasonably open to two constructions, we will adopt that construction which is more favorable to the insured."

Judge DITHRICH also directed a very appropriate query in the direction of the insurance company, namely, "if the insurer did not intend to use the word "war" in its technical and legal sense, i.e., war declared by Congress, but intended it to include undeclared war as well, why was that provision not inserted in the contract"? Further: "The contract presumably was prepared by competent insurance company attorneys, who, no doubt, were familiar with the most recent decisions relating to war risk provisions in insurance contracts; and if the appellee did not intend to assume risks growing out of hostilities short of war it could have so provided by extending the phrase 'in time of war' to include undeclared war."

In the case of *West v. Palmetto State Life Ins. Co.,* 202 S. C. 422, 25 S.E. 2d 475, the insured was, like Captain Bennion, also killed at Pearl Harbor on December 7, 1941. His insurance policy carried the provision that double indemnity for accidental death would not be payable in the event that death should occur while the insured was "engaged in military or naval service in time of war." In allowing recovery, the Supreme Court of South Carolina pointed out that the exclusionary provisions in the insurance policies under consideration were written in contemplation of the law of the United States under which only Congress may declare war, which of course it had not done

at the time of the bomber attack on our fleet at Pearl Harbor. Thus, the Japanese aerial assault of December 7, 1941, "did not constitute war in the legal sense or within the meaning thereof intended in the policies." The Court also took judicial notice of the fact that at the time of the Pearl Harbor aggression high diplomatic representatives of Japan were conferring with the President and Secretary of State of the United States, "professedly in an effort to preserve peace, from which, and the other facts of record, it was found that a state of war did not at that time exist between the two nations."

After quoting from various authorities, the Court said: "It is seen from the foregoing authorities that the declaration by Congress of war on Japan on December 8 was the only legal way in which this country could be placed in a state of war with that aggressor nation. The Constitution so provides, Art. 1, §8, supra. *That the policy contracts were entered into by the parties in contemplation of that clear law, and subject to it, cannot be denied; and they are bound by it.*" (Emphasis supplied.)

It can only be assumed in the case at bar that the parties accepted the insurance contract in May, 1945, "in contemplation of the law of the United States under which only Congress can declare war."

If the Beley insurance contract had included the phrase "undeclared war," which the Korean conflict indubitably is, no problem would have arisen because the Korean conflict, in the constitutional sense, indubitably is an undeclared war. However, since that phrase does not appear in the contract, we are compelled to unclasp the book of history of 1945 and scan the pages of the times immediately preceding and surrounding the writing of the contract.

In May, 1945, the shadows of the pending complete and unequivocal defeat of Germany and Japan had

fallen over the globe. The United Nations was also an assured reality even though officially and definitively it did not come into being until October 24, 1945. The United Nations sprang from the resolutions in the hearts of the peoples of the world: "to save succeeding generations from the scourge of war, which twice in our lifetime has brought untold sorrow to mankind."

The three main bodies of the United Nations are the General Assembly, the International Court of Justice and the Security Council. The Security Council consists of eleven nation-members. It is one of the main functions of the Security Council to: (Art. 39) ". . . determine the existence of any threat to the peace, breach of the peace, or act of agression and shall make recommendations, or decide what measures shall be taken in accordance with Articles 41 and 42, to maintain or restore international peace and security."

Article 42 of the Charter provides as follows: "Should the Security Council consider that measures provided for in Article 41 would be inadequate or have proved to be inadequate, it may take such action by air, sea, or land forces as may be necessary to maintain or restore international peace and security. Such action may include demonstrations, blockade, and other operations by air, sea, or land forces of Members of the United Nations."

Paragraphs 1 and 2 of Article 43, provide: "1. All Members of the United Nations, in order to contribute to the maintenance of international peace and security, undertake to make available to the Security Council, on its call and in accordance with a special agreement or agreements, armed forces, assistance, and facilities, including rights of passage, necessary for the purposes of maintaining international peace and security.

"2. Such agreement or agreements shall govern the numbers and types of forces, their degree of readiness

and general location, and the nature of the facilities and assistance to be provided."

For five thousand years of recorded history the earth has run red with the blood of war. The people of the various nations convulsed by these wars were powerless to resist the orders of kings, queens, kaisers, sultans, emperors, pashas and other absolutists, who ordered them into battle in order to achieve land, loot, power or glory or even to satisfy sadistic whim or caprice entirely foreign to the welfare of those who did the fighting.

Following the termination of each war the monarchs or chieftains returned to their respective thrones or tribal mansions, leaving the dead to bury their dead and the maimed and crippled to manage their misery as best they could. No impartial attempt was ever made, by any responsible body, after each vast outpouring of blood, to determine who was right and who was wrong, because both sides in so catastrophic a voluntary enterprise could not have been in the right.

Humanity had been crucified between the thieves of Arrogance and Greed, and yet there was no adjudication anywhere as to who was guilty for driving the nails.

From time to time mankind pleaded for a cessation of this licentious extermination. Societies of brothers were formed, pledged against armed conflict, religious bodies held aloft the holy symbols of peace, but these societies and organizations were scattered and trampled under the galloping hooves of Conquest and Domination when tyrants drew the sword to carve for themselves greater territories and greater power.

In 1918, after a world war which killed off more than 15,000,000 persons and took many nations to the brink of physical disaster and moral bankruptcy, wise and noble heads invited the peoples of the world, sprawled in the dust and debris of the ruined temple of sacred human life, to rise and join together in the formation of a world understanding. The people realized that in

wars of this character they were the ones who were always the losers, whether on the so-called winning side or on the losing side, and they evinced a great willingness for an international organization that would insure that peace even if paradoxically it had to be accomplished by force.

And the League of Nations was formed.

A towering lamp to light up the criminal folly of war, no matter where or how begun, rose above the highest mountains and the highest nationalistic prides and prejudices, but in the absence of the United States to replenish the moral and material oil in this beacon, the light burned low and in the succeeding darkness, a psycopathic paperhanger stole away again the gem of peace and the jewel of world understanding.

Adolf Hitler would never have been able to insult, threaten and finally challenge the world to a contest in blood and intestines if the League of Nations had spoken with the authority it possessed. Had the United States been a member of that global assembly, a strait jacket would have been thrown around the Nazi madman at his first predatory move, and World War II would have been only a subject for fantastically imaginative writers.

When this most gigantic of all wars had run its bloody course, an international agreement established a tribunal to adjudicate the guilt or innocence of those charged with having precipitated the holocaust which wiped out more than 30,000,000 of the world's population, reduced nations to ruin and rubble, and introduced into language the most horrible word since man babbled to man—that of genocide. The tribunal was also to expose to the world the workings of the most brutal engine ever devised for the production of misery and horror—the concentration camp and exterminating oven.

That tribunal heard evidence, reviewed events, studied the plots and plans of those who wrought this incredible havoc to earth and man, and, after rendering judgment against the responsible individuals, formally pronounced that War is evil because "its consequences are not confined to the belligerent States alone, but affects the whole world."

It declared further that "to initiate a war of aggression, therefore, is not only an international crime; it is the supreme international crime differing only from other war crimes in that it contains within itself the accumulated evils of the whole."

To forestall that another aggressive war with all its even more deadly and terrorsome machinery of destruction could now conceivably erase civilization completely and blot out life itself from the planet earth, representatives from all parts of the world entered into that compact which, we have seen, is the United Nations. The sixty nations, which now constitute the United Nations, all have their own individual flag, but each lends a ray or tint into making up the supreme banner—the banner of Peace.

In the latter part of 1950 Andrew Beley sailed from the shores of America under that banner. He wore a soldier's uniform, he bore a soldier's arms, he was skilled in the art and science of war but his mission was Peace. Never was a sword drawn, a cannon fired or a bullet discharged in a worthier cause than that to which Andrew Beley dedicated himself as he neared the bleak and gnarled land of Korea. And never did one offer a holier tribute to that cause than did Andrew Beley when on March 7, 1951, he gave his life for peace and the preservation of the liberties which every American understands in the word Peace.

The participation of the United States in the Korean affair had but one object and but one purpose—Peace.

Peace not merely for today but for all time. Of course, this same thing has been said during other international conflicts but we have seen how permanent peace was never achieved because of the failure of a strong enough world federation to enforce upon nations the obligations they had voluntarily assumed.

The Soviet Union is a voluntary signatory to the charter of the United Nations. The Soviet Union has violated the letter and the spirit of its obligations under the United Nations charter by directing the attack of North Korea on South Korea, and by lending material aid to the aggressive war being waged by North Korea and Red China against South Korea.

For the United Nations to have shirked its legal responsibilities under Article 42 of the Charter would have been to betray all mankind. To have failed to resist the North Korean Communist aggression would have meant to repudiate Article 42. To repudiate Article 42 would be to abandon the whole purpose of the United Nations, and to throw the peoples of the world back into the bloody pit of suicidal war.

To have yielded to the Communist aggression in June, 1950, would have meant to invite similar and more wide-sweeping aggressions in Asia and Europe.

As stated by Judge LEWIS in his learned opinion (supra): "The invasion of the North Korean troops was a definite act of aggression and a threat to world peace. Unless the United Nations prevented such a threat to peace it would collapse as an international force."

Korea is the test of the human race to live by reason and not by force, to settle differences in the scales of justice and not in the muzzles of cannon. If this test fails in Korea, civilization is doomed. Winning the test does not mean militarily winning or losing the conflict; it means a never-yielding and unflagging upholding of the principle that aggressive war is the supreme

crime, the crime that can never be condoned or its unspeakable consequences palliated.

Americans generally believed in 1945 that the blossomtime of Hope had arrived, and that the Four Horsemen of the Apocalypse would never again gallop their martial steeds across the bleeding face of the earth. We had reason to believe that with the world assembled in the Parliament of Man, the war clause in our own Constitution could conceivably gradually become obsolete. Expeditionary missions there would be; the enforcement of the decisions of the United Nations would entail the commitment of groups of our armed forces, together with those of other nations, to remote crossroads on the globe, but full-scaled wars—with the United States alone on one side and another or other nations on the other side—was a possibility that we believed was melting rapidly in the crucible of international amity.

It was against that background of general understanding, (whether the drafters of the Beley insurance policy consciously realized it or not,) that the contract here before us was written. And it may well be that, because of our responsibilities under the Charter of the United Nations, Congress will never be called upon again to declare war in its originally accepted significance. According to Article 39, supra, the Security Council "shall determine the existence of any threat to the peace, breach of the peace, or act of agression, and shall make recommendations." Since defensive war on our part could only come about through aggression against us (which subject matter is now in the exclusive hands of the United Nations) and since we would never wage an aggressive war ourselves, it is exceedingly problematical that there ever would be another occasion for Congress to declare war except merely to confirm action already agreed upon by the United Nations.

It might be that, in this new state of affairs, an amendment to the Constitution will be in order to assign to Congress the sole power to determine when our military forces are to be used in implementing a decision of the United Nations Security Council. Obviously, under present constitutional interpretation superimposed over current international obligations, the President can commit our armed forces into military actions on a scale which can equal and even surpass in magnitude the congressionally declared wars of the past. Whether the people of the nation desire that this shall remain a fixed attribute of the executive power of government, thus vitally curtailing the powers of the legislative branch of our government, is a matter for serious concern. However, this is simply an observation of the writer not needed to the adjudication of this case.

From all the above, I conclude that Andrew Beley did not come to his death as the result of a state of War as contemplated by the contracting parties and that, therefore, the plaintiff is entitled to recover the full value of the policy.

I would, therefore, affirm the judgment of the Superior Court.

---

DISSENTING OPINION BY MR. JUSTICE BELL:

Mrs. Beley on May 1, 1945, more than 5 years before the outbreak of the Korean War, obtained a policy of life insurance on her son, Andrew Beley, who was then seventeen years of age. The policy provided for a monthly premium of $2.18, including an additional monthly premium of 20¢ for double indemnity in case of *accidental death.* The policy included a clause limiting liability to a return of the premiums in the event that the "insured engages in *military* or naval *service in the time of war*";* unless the insured shall have pre-

---

* Italics throughout, ours.

viously secured from the Company a permit to engage in such service. It is conceded that such a permit had not been requested or secured.

The beneficiary also claimed "accidental death benefits" under the supplemental contract for additional *accidental death* benefits which was a part of the policy. This supplement provided: "Additional Accidental Death Benefit:—If the proofs of death . . . show that the death of the Insured resulted directly and independently of all other causes from bodily injuries sustained . . . through . . . *accidental means,* . . . then upon such proof, the Company will pay to the beneficiary of record . . . additional amount of indemnity equal to the face amount payable under said Policy, . . .

"Risks Not Assumed—The Company shall not be liable for the additional Accidental Death Benefit specified above if said death shall result by reason of any of the following: . . . (d) *Military,* air or naval service *in time of war.* (e) Any work in connection with *actual warfare,* riot, insurrection, police duties or any act incidental thereto, either on land or water . . . (g) *Intentional injuries inflicted by any other person."* A termination clause also provided that the provisions for additional accidental death benefit "shall immediately terminate: . . . (b) if the Insured shall at any time, voluntarily or involuntarily, engage in military, . . . service in time of war; . . .".

Several years thereafter, Andrew Beley served in the army without the knowledge or permission of the insurance company and was killed in action in Korea on March 7, 1951. The insurance company denied liability and the beneficiary sued in assumpsit.

Although learned and distinguished Judges have allowed a recovery under this policy, their decision seems to me incomprehensible. The majority, I believe, ignore all the other language, terms and conditions of the policy—which are insuperable barriers to recovery—

and pin their decision on one word "war". They hold that the Korean War is not War. This will shock millions and millions of American citizens and especially Korean veterans and their families. Every man, woman and child in America is informed by the newspapers and radio and knows that there are many thousands of American soldiers, sailors, marines and airmen who are now and for several years have been engaged with soldiers of North Korea and of China in open actual warfare. Our Navy is constantly patrolling and bombarding the coasts of North Korea; our Air Force is having daily dog fights with the enemy, and our soldiers are daily killing the enemy and being killed. We have for over two years been engaged in negotiations for a truce and are vainly trying *to exchange prisoners of war.* The United States casualties exceed 128,000. How is it humanly possible to say that the Korean War is not war? Moreover, even if the majority's construction of that one word "war" were correct, it does not meet or answer, as we shall see, the other pertinent provisions of the policy which prohibit recovery.

The parties to a private contract, unaffected by a public interest, can make any agreement they wish (unless it is against public policy). The question therefore is: What did this private contract insure against? The majority change and *limit* the policy to read "if death shall result by reason of military service in war"; and then hold that the word "war" means a "Constitutional" war; and the Korean War is not a Constitutionally declared war. A reading of the policy will quickly demonstrate that the risk it covered, paid for and insured against, covered and was intended to cover peacetime activities in contradistinction to wartime activities.

The greater likelihood of death occurring, and the consequent increase in the risk assumed by the Insurance Company if the insured engaged in military service in time of war, is manifest; and it would seem obvious

that the premium or cost would undoubtedly be much larger if the risk included death from war than if it only included death from peacetime activities. It is likewise obvious that the risk or likelihood of death would be equally great whether the insured was engaged in military service in time of actual war or in time of a "constitutionally declared" war; and consequently the line of distinction or demarcation which the majority seek to draw has no basis, reason or logic to support it.

Was this "an accidental death"; did death result from "military service in time of war"; or if not, did death result from work in connection with "actual warfare"; or if not, did death result from "intentional injuries inflicted by another person"; or if not, what did death result from? The majority's only attempt to answer these questions is to discuss the word "war".

It is well settled that ordinary words are to be given their ordinary and generally understood meaning, unless the instrument itself, considered in the light of the surrounding circumstances, clearly shows them to have been used in a technical or different sense. "The standard for the interpretation of words is their natural meaning to the parties who have contracted at the time and place where the contract is made, considering all the circumstances surrounding it: McMillin v. Titus, 222 Pa. 500. But, as is stated in Williston, volume 2, section 607, page 1169, 'This rule has never been recognized as authorizing the interpretation of plain and unambiguous language of a written instrument in accordance with any other meaning than that indicated by the words used in the instrument.' . . . Words are to be construed according to their primary acceptation unless, from the context of the instrument and the intention of the parties to be collected from it, they appear to be used in a different sense"; Foundation and Construction Co. v. Franklin Trust Co., 307 Pa. 10, 15, 160 A. 711. See also to the same effect: Hesse v. Travelers Ins. Co.,

299 Pa. 125, 149 A. 96; *Aschenbrenner v. U.S.F. & G. Co.,* 292 U.S. 80; Restatement, Contracts, sec. 235.

Plaintiff in order to recover must therefore prove (1) that death was *"accidental"* and (2) that death did not result (a) from military service *"in time of war"*, or (b) from *"actual warfare"*, or (c) *from "intentional injuries inflicted by another person"*, as these terms are ordinarily understood and accepted.

It is said that there have been 156 armed fightings in the history of our Country. Some of these have been wars, some not; each case depends upon its own particular facts. In this case the mere fact that President Truman has declared the Korean War to be a "police action" does not, irrespective of his motives, make it so in construing a private contract of insurance.*

Although for political or international reasons, or to save the "position" of their leader, the majority in Congress have not formally declared war against the North Koreans or Red China, *the Congress* (as well as every person in the civilized world) *knows that the United States is at war in Korea.* See for example, the Veterans' Readjustment Assistance Act of 1952, Public Law 550, (U. S. Code Congressional and Administrative News 1952, p. 3903-3929); and the 1952 Amendment to the Veterans' Compensation Rates statute, Public Law 427, (U. S. Code Congressional and Administrative News 1952, p. 3028). In the legislative history of the Veterans' Compensation Rates statute of 1952 it is said pages 3320-3321): "Your committee . . . believes

---

* Moreover, if contrary to the belief of countless millions of American citizens, the Korean War is not war but only "a police action" as President Truman and his Administration say, does it not follow that a soldier killed therein was performing *"police duties* or any act incidental thereto, either on land or water", and hence cannot recover under the express terms of the policy!

that the bill, as amended, will provide uniformity for *veterans of all wars* insofar as it deals with the statutory awards for the more seriously disabled groups . . . . All the provisions of this bill apply entirely and exclusively to service connected veterans of the Spanish-American War group, World Wars I and II and veterans of service on or after June 27, 1950." (Date of Korean conflict).

Congress has also made provision for the use of United States troops in Korea by making appropriations totaling billions of dollars (Public Law 843, 81st Congress, Supplemental Appropriation Act of 1951). Furthermore, the Revenue Act of 1950 provides for certain income tax exemptions for members of the Armed Forces serving in combat zones, Korea being, of course, in this category. (Public Law 814, 81st Congress, sec. 202). But all of this deals with political questions and with issues arising thereout; it does not deal with private contracts and their meaning and intent.

In *Stankus v. New York Life Insurance Company*, 312 Mass. 366, the Supreme Court of Massachusetts, in considering a similar policy of insurance with respect to the death of a seaman on a United States Destroyer (killed when his ship was torpedoed while she was convoying merchant ships in the Atlantic in October, 1941, *before* a declaration of war against Germany and her allies) held that *"death resulted from war or an act incident thereto."* The Court said: "As in the case of any other contract, the words of an insurance policy, in the absence of ambiguity, must be given their usual and ordinary meaning. *The term 'war' is not limited, restricted or modified by anything appearing in the policy. It refers to no particular type or kind of war, but applies in general to every situation that ordinary people would commonly regard as war.* There is noth-

ing in the policy that indicates that the word was used in any vague, indefinite or ambiguous sense. A policy of insurance whose provisions are plainly and definitely expressed in appropriate language must be enforced in accordance with its terms. . . .

"A conflict between the armed forces of two nations under authority of their respective governments would be commonly regarded as war."

The Supreme Court of the United States as early as 1799 held that our Country was actually at war with France although no formal declaration of war was made by Congress. *Bas v. Tingy,* 4 Dallas 37. Mr. Justice CHASE stated: The decision of this question depends on "whether, at the time of passing of act of congress of the 2d of March 1799, there subsisted a state of war between the two nations. . . . What then is the nature of the contest subsisting between America and France? In my judgment it is a limited, partial, war. Congress has not declared war in general terms; but congress has authorized hostilities on the high seas by certain persons in certain cases . . . . So far it is, unquestionably, a partial war; but, nevertheless, it is a public war, on account of the public authority from which it emanates." Also, Mr. Justice WASHINGTON, agreeing, said: "It may, I believe, be safely laid down, that every contention by force between two nations, in external matters, under the authority for their respective governments, is not only war, but public war."

As recently as *Youngstown Sheet & Tube Co. v. Sawyer,* (Steel Seizure Case), 343 U. S. 579, (1952) Mr. Justice JACKSON said (page 642) : *"Of course, a state of war may in fact exist without a formal declaration."*

Many Courts throughout the land have held that war can exist between the United States and the armed forces of another nation de facto or de jure, without any formal declaration of war; and that *war means actual*

*war*: *New York Life Ins. Co. v. Bennion*, 158 F. 2d 260; *Mutual Life Ins. Co. of New York v. Davis*, 79 Ga. App. 336 (1949); *Dole v. Insurance Co.*, 51 Me. 465, 470; *Prize Cases*, 2 Black 635; *Darnall v. Day*, 240 Iowa 665, 37 N.W. 2d 277; *Lincoln v. Harvey*, Texas Civil Appeals, 191 S.W. 2d 764.

*More important still, the boys who are engaged in the Korean War, their families and untold millions of American citizens have recognized* that this tragic episode in our lives is War—*the Korean War!* They agree with the Supreme Court of Maine which said in *Dole v. Insurance Co.*, 51 Me., supra, (involving an insurance policy on a ship sunk by a Confederate ship.) "War is an existing fact, and not a legislative decree. . . . it exists, whether there is any declaration of it or not."

A similar decision in point is *Mutual Life Insurance Co. v. Davis*, 79 Ga. App. 336, 53 S.E. 2d 571. In that case the insured, while serving in the Army was killed on August 19, 1945, as the result of the explosion of an ammunition dump in Germany. The policy read: " 'The double indemnity will be payable . . . the insured died as a direct result of bodily injuries . . provided that the double indemnity shall not be payable if death resulted . . from *military* or naval *service* in *time of war*, or from any act incident to war . .' ".

The question was whether or not World War II was over within the meaning of the phrase "military service in time of war". The Court said: "Military or naval service in time of war is recognized as a hazardous occupation. This extreme danger exists because in time of war opposing military and naval forces are constantly attacking each other in an all-out effort to accomplish utter destruction. This hazard either does not exist at all or exists to a very limited extent at a time when the shooting war is over and the state of warfare continues to exist only because of the lack of

completion of negotiations of the terms of peace." The Court then held that for the purposes of construing this insurance policy there was no war (or any act incident thereto) at the date of the explosion and consequently plaintiff could recover the double indemnity.

In *New York Life Ins. Co. v. Bennion*, 158 F. 2d 260, the insured was killed at Pearl Harbor (12/7/41) before any actual declaration of war. The insurance policy provided for double indemnity for accidental death but excluded from its coverage "death . . . resulting from war or any act incident thereto." The Court held there could be no recovery under a double indemnity clause of the policy *since war meant actual war or actual warfare.* The Court said: "When one sovereign nation attacks another with premeditated and deliberate intent to wage war against it, and that nation resists the attacks with all the force at its command, *we have war in the grim sense of reality. It is war in the only sense that men know and understand it.* Mankind goes no further in his definitive search— *he does not stand on ceremony or wait for* technical niceties. . . .

"The subject matter of the contract was a risk assumed on the life of the insured by the Company, for a stipulated premium, and the use of the word war was obviously intended to denote a restriction or limitation upon the risk assumed. It is plain, therefore, that the definition given to the word war bears a direct relationship to the risk assumed, which is the subject matter of the contract. Viewed in this light, it is also plain that when the parties used the word war, they had in mind the hazard to human life incident thereto."

In the *Prize Cases*: The *Amy Warwick*: 2 Black 635 (1862), various vessels were captured and brought in as prizes by public ships of the United States. Their seizure and condemnation were sustained by the

Supreme Court of the United States *because actual war existed although there had been no declaration of war.* The Court said: "A state of actual war may exist without any formal declaration of it by either party; and this is true of both a civil and foreign a war."

With due regard for my colleagues who differ with me, a holding that under the provisions of this policy the Korean War is not War—in the face of 128,000 American casualties—is so unrealistic and legalistic as to be utterly unjustifiable.

But what about the rest of this insurance policy—language which clearly sets forth the intent of the parties and which the majority ignore! This insurance policy provides that the company shall not be liable for additional *accidental* death benefits "if said death shall result *by reason of . . .* (e) *Any work in connection with actual warfare, . . . .*" *"Actual* warfare" cannot possibly mean *"Constitutional"* warfare; there is no such thing! The policy also prohibits the recovery of *accidental* death benefits if death results from "(g) *Intentional injuries inflicted by any other person".* How can this provision be avoided or ignored or be held inapplicable when death unquestionably resulted from "intentional injuries inflicted by another person"!

Equally important, how is it possible to ignore or distort those clear, unambiguous words "accidental death"? It is instantaneously offensive to our knowledge, our experience and all our senses to say that *this was an accidental death.*

If authority be needed for anything so obvious, it may be found in *Hesse v. Traveler's Ins. Co.,* 299 Pa. 125, 149 A. 96; *Urian v. Equitable Life Assurance Society,* 310 Pa. 342, 165 A. 388; *Arnstein v. Metropolitan Life Insurance Co.,* 329 Pa. 158, 196 A. 491. The leading case of *Urian v. Equitable Life Assurance Society,* 310 Pa., supra, is directly in point and governs

the instant case. In that case the beneficiary sued on insurance policies which contained double indemnity *provisions identical with the provision in the instant case.* The Court found that death was accidental where the insured died from inhalation of carbon monoxide gas discharged by the engine while he was attempting to repair his automobile in his garage. The door was open, the gas was odorless and the plaintiff proved that inhalation for a period of 10 seconds would cause death. The Court reviewed the many cases on the subject of "accidental means" and in a very able opinion said: "All the policies provided that double indemnity should be paid if the death of the insured resulted 'solely from bodily injuries caused directly, exclusively and independently of all other causes by external, violent, and purely accidental means.'* The principal question raised by this appeal is where death was caused by 'accidental means.' It is not disputed that it was the result of 'external and violent' means.

"The expression 'accidental means' has been in use in policies of insurance for more than fifty years. It has been interpreted in nearly every state in the union. The case which is most often quoted is probably U. S. Mut. Acc. Assn. v. Barry, 131 U. S. 100, where the following instructions were approved by the Supreme Court of the United States: 'If a result is such as follows from ordinary means, voluntarily employed, in a not unusual or unexpected way, it cannot be called a result effected by accidental means; but if, in the act which precedes the injury, something unforeseen, unexpected, unusual occurs which produces the injury, then the injury has resulted through accidental means.' This is substantially the definition given in the text-

---

* The policy in the instant case contains an identical double indemnity provision.

books: 6 Cooley, Briefs on Insurance (2d edition) 5234; Couch, Insurance, section 1137; Vance, Insurance, 871.

"Another frequently quoted definition is that given by Sandborn, J., in Western Comm. Travelers' Assn. v. Smith, 85 Fed. 401: *'An effect which is the natural and probable consequence of an act or course of action is not an accident, nor is it produced by accidental means.* It is either the result of actual design, or it falls under the maxim that [every man must be held to intend the natural and probable consequence of his deeds]. On the other hand, an effect which is not the natural or probable consequence of the means which produced it, an effect which does not ordinarily follow and cannot be reasonably anticipated from the use of those means, an effect which the actor did not intend to produce and which he cannot be charged with the design of producing, . . . is produced by accidental means. *It is produced by means which were neither designed nor calculated to cause it.* Such an effect is not the result of design, cannot be reasonably anticipated, is unexpected, and is produced by an unusual combination of fortuitous circumstances; *in other words, it is produced by accidental means.'* . . .

"Our cases have uniformly held that where the cause of injury or death was an act of the insured, the means which caused the result, to be accidental, must be undesigned and unintentional, that accidental injury or death is an unintended and undesigned result arising from acts done, *while injury or death by accidental means is a result arising from acts unintentionally done.* Thus, recovery was allowed on these principles in Taylor v. Gen. Acc. Ass. Corp., 208 Pa. 439; Erb v. Comm. Mut. Acc. Co., 232 Pa. 215; Kelley v. Pittsburgh Cas. Co., 256 Pa. 1; Eby v. Travelers Ins. Co., 258 Pa. 525; Bloom v. Brotherhood Acc. Co., 85 Pa. Superior Ct. 398; Horan v. Prudential Ins. Co., 104 Pa. Superior Ct. 474; see

Pickett v. Pac. Mut. Life Ins. Co., 144 Pa. 79; and denied in Hesse v. Traveler's Ins. Co., supra; Semancik v. Continental Cas. Co., 56 Pa. Superior Ct. 392; Trau v. Preferred Acc. Ins. Co., supra; Camp v. Prudential Ins. Co., 107 Pa. Superior Ct. 342."

The limited nature of this policy is further apparent from the fact that, according to its express terms, accidental death benefits cannot be recovered if death results from suicide, from flying, from participating in a submarine descent, from participating in an assault or felony, or from taking poison or inhaling gas, or from bodily or mental disease, or from bacterial infection. In other words, it is clear as crystal that *accidental death* meant *accidental death*; and the parties intended to limit the accidental death benefits to (a) death resulting from an accident, with the further limitation (b) that the accident must not result from flying, or from a submarine descent, or from a fight, or from a felony, or from intentional injuries inflicted by another. The majority opinion makes no attempt to discuss, let alone refute, the requirement of *accidental* death *or the specific additional limitations* which we have just pointed out. The reason for their omission seems obvious.

These limitations clearly define and illuminate and limit the intentions of the parties and create and constitute insuperable barriers to a recovery under the facts of this case!

For each of these reasons I would affirm the judgment of the Court of Common Pleas.

---

DISSENTING OPINION BY MR. JUSTICE CHIDSEY:

I agree with the majority that the disposition of this case depends upon the meaning to be given the word "war" in the policy of insurance involved, but I dis-

agree with their interpretation. The likelihood of death occurring and the consequent increase in the risk assumed by the insurer if an insured voluntarily or involuntarily engages in military service in time of war, is manifest. The exclusion or termination of liability of the insurer in such event is therefore founded upon good reason, readily understandable by both parties to the insurance contract. The greater likelihood of an insured's death when engaged in military service in time of war exists whether the war is a declared or "constitutional" war, or an undeclared war. The reason for the exclusion applies equally in either instance. The word "war" used without limitation or restriction, in my opinion should be construed as the word would ordinarily be used and understood and calls for no technical construction. Certainly a major conflict between the armed forces of two nations under authority of their respective governments would be commonly regarded as war. I think that the present conflict in Korea is a war within the meaning of the exclusionary provisions of the policy, and therefore dissent from the view of the majority.